# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| **AKRON THERMAL, LIMITED** | : | **Case No. 5:09MC-10** |
| **PARTNERSHIP,** | : | |
| | : | **Judge Oliver** |
| Debtor and | : | |
| Debtor-in-Possession. | : | |
| | : | |
| **CITY OF AKRON,** | : | |
| | : | |
| Appellant, | : | |
| | : | |
| v. | : | |
| | : | |
| **AKRON THERMAL, LIMITED** | : | |
| **PARTNERSHIP,** | : | |
| | : | |
| Appellee. | : | |

## MEMORANDUM OF AKRON THERMAL, LIMITED PARTNERSHIP IN OPPOSITION TO THE CITY OF AKRON'S MOTION FOR STAY PENDING APPEAL

Daniel R. Swetnam      (0011022)
Tyson A. Crist      (0071276)
SCHOTTENSTEIN, ZOX & DUNN CO., LPA
250 West Street, Suite 700
Columbus, OH 43215
(614) 462-2700; Fax: (614) 462-5135
Email:    dswetnam@szd.com
       tcrist@szd.com

and

M. Colette Gibbons      (0003095)
Robert M. Stefancin      (0047184)
1350 Euclid Ave., Suite 1400
Cleveland, OH 44115
(216) 394-5068; Fax: (216) 394-5085
Email:    cgibbons@szd.com
       rstefancin@szd.com

*Attorneys for Akron Thermal, Limited Partnership, Appellee*

## TABLE OF CONTENTS

I.     BACKGROUND .................................................................................................2

II.    STANDARDS REQUIRED FOR ISSUANCE OF A STAY...............................7

III.   THE MOTION SHOULD BE DENIED BECAUSE THE CITY HAS FAILED TO SATISFY THE NECESSARY CRITERIA FOR A STAY PENDING APPEAL ..........................................................................................................8

     A.    The City Has Not Demonstrated a Likelihood of Success on the Merits ...............8

         1.    Embedding of Lease Assumption into Confirmation Process ..................11

         2.    Environmental Issues ...............................................................................14

         3.    ATLP has Properly Maintained the Facility .............................................18

         4.    Extension of Lease....................................................................................26

         5.    Termination of Lease ................................................................................29

         6.    Release of Third Parties ...........................................................................40

     B.    The City has not Established That It will Suffer Irreparable Harm ......................40

     C.    ATLP, Along With Its Creditors, Customers and Others Will Suffer Substantial and Irreparable Harm if a Stay is Granted .........................................44

         1.    Issuance of a Stay Jeopardizes the Plan Itself...........................................44

         2.    Issuance of a Stay Hinders ATLP's Ability to Operate its Business.........45

         3.    Issuance of a Stay Hinders ATLP's Ability to Negotiate Terms with its Customers......................................................................................46

         4.    Issuance of Stay Undermines ATLP's Working Capital. ..........................47

         5.    Issuance of a Stay Delays Collection of Higher Rates from Canal Place and Others. ....................................................................................48

         6.    Issuance of a Stay Precludes ATLP's Access To Additional Funds. ........48

         7.    Issuance of a Stay Would Derail the Settlement with the USEPA. ...........49

         8.    Issuance of a Stay Undermines the Ability of ATLP to Resolve the Injunctive Claims of USEPA. ...................................................................50

         9.    According to the City, Issuance of a Stay Could Cause it Harm. ..............51

i

10. Issuance of a Stay Precludes the Ability to Pursue Coal Gasification. ...............................................................................52

11. Issuance of a Stay Delays Payments to Creditors. ....................................53

12. Issuance of a Stay Will Result in Higher Administrative Costs. ...............53

D. A Stay Would Harm the Public Interest ..................................................................54

IV. POSTING OF *SUPERSEDEAS* BOND...........................................................................56

V. CONCLUSION.................................................................................................................58

## **TABLE OF AUTHORITIES**

### **Cases**

*Acton v. Fullmer (In re Fullmer)*, 323 B.R. 287, 293 (Bankr. D. Nev. 2005) ................................. 7

*Baker v. Adams County/Ohio Valley Sch. Bd.*, 310 F.3d 927, 928 (6th Cir. 2002) ...................... 40

*Bates & Springer, Inc. v. Nay*, 187 N.E.2d 415, 91 Ohio Law Abs. 425 (1963).................. 37, 38

*Bella Vista Apts. v. Herzner,* 125 Ohio Misc. 2d 1, 2003-Ohio-4872 {¶ 7}, 796 N.
E.2d 593 ............................................................................................................................ 34

*By-Rite Distrib., Inc. v. Brierley (In re By-Rite Distrib., Inc.)*, 55 B.R. 740 (D.
Utah 1985) ................................................................................................................... 11, 12

*Craig Wrecking Co. v. S.G. Loewendick & Sons, Inc.*, 38 Ohio App.3d 79, 526
N.E.2d 321 (1987) .............................................................................................................. 31

*Elkton Assocs. v. Shelco Inc.*, 107 B.R. 483, 486 (Bankr. D. Del. 1989) ..................................... 35

*Finkbeiner v. Lutz* (1st Dist. 1975), 44 Ohio App.2d 223, 226-27, 337 N.E.2d 655.................. 38

*Finn v. Meighan*, 325 U.S. 300, 65 S.Ct. 1147, 89 L.Ed. 1624 (1945) ........................................ 35

*Gorsuch Homes Inc. v. Wooten*, 73 Ohio App.3d 426, 597 N.E.2d 479 (1992)........................... 35

*Greenbriar Estates v. Eberle*, 130 Ohio Misc.2d 11, 15, 2005-Ohio-1139 {¶ 12},
824 N.E.2d 172 (Clermont Cty. 2005)........................................................................... 34, 35

*Harris v. United States*, 745 F.2d 535, 536 (8th Cir. 1984)........................................................ 41

*Horn v. LaPille*, 1984 WL 6969 (1st Dist. 1984) ....................................................................... 28

*In re 1345 Main Partners, Ltd.*, 215 B.R. 536, 541 (Bankr. S.D. Ohio 1997)31, 33, 34, 35, 36, 38

*In re Adelphia Communications Corp.*, 361 B.R. 337, 346 (S.D.N.Y. 2007) ............. 8, 42, 44, 57

*In re Adelphia Communications Corp.*, 368 B.R. 140, 282-83 (Bankr. S.D.N.Y.
2007) ............................................................................................................................. 8, 55

*In re Baldwin United Corp.*, 45 B.R. 385, 386 (Bankr. S.D. Ohio 1984)................... 8, 42, 44, 45

*In re Bankruptcy Appeal of Allegheny Health, Educ. and Research Found.*, 252
B.R. 309, 331 (W.D. Pa. 1999).......................................................................................... 54

*In re Brown*, 290 B.R. 415, 424 (Bankr. M.D. Fla. 2003)............................................................ 54

*In re Burns Fabricating Co.*, 61 B.R. 955, 956 (Bankr. E.D. Mich. 1986)................................ 11

*In re Charter Co.*, 72 B.R. 70, 72 (Bankr. M.D. Fla. 1987) ....................................................... 42

*In re Convenience USA, Inc.*, 290 B.R. 558, 563 (Bankr. M.D.N.C. 2003) .................... 42, 45, 55

*In re Cook United, Inc.*, 53 B.R. 342, 345 (Bankr. N.D. Ohio 1985)......................................... 13

*In re Crescenzi*, 58 B.R. 141, 142-44 (Bankr. S.D.N.Y. 1986) .................................................. 40

*In re Dakota Rail, Inc.*, 111 B.R. 818, 820 (Bankr. D. Minn. 1990).................................. 8, 10, 42

*In re Delta Paper Co., Inc.,* 74 B.R. 58, 59-60 (Bankr. E.D. Tenn. 1987)............................ 11, 12

*In re Dow Corning Corp.*, 255 B.R. 445, 542 (E.D. Mich. 2000) ................................................ 8

*In re F.G. Metals, Inc.,* 390 B.R. 467, 471 (Bankr. M.D. Fla. 2008) ................ 7, 8, 41, 42, 53, 54

*In re Fleetwood Motel Corp.* ....................................................................................................... 35

*In re Fontainebleau Hotel Corp.*, 515 F.2d 913 (5th Cir. 1975) ................................................ 33

*In re Fry Bros. Co.*, 52 B.R. 169 (Bankr. S.D. Ohio 1985) ........................................................ 34

*In re Great Barrington Fair and Amusement, Inc.*, 53 B.R. 237, 240 (Bankr. D.
Mass. 1985).................................................................................................................. 42, 53

*In re Lazarus Burman Assocs.*, 161 B.R. 891, 901 (E.D.N.Y.) ................................................. 54

*In re Level Propane Gases, Inc.*, 304 B.R. 775, 777 (Bankr. N.D. Ohio 2004) ............................ 8

*In re Lickman*, 301 B.R. 739, 742 (Bankr. M.D. Fla. 2003)........................................ 7, 10, 42, 54

*In re Memphis-Friday's Assocs.*, 88 B.R. 830, 834 (Bankr. W.D. Tenn. 1988)........................... 33

*In re Memphis-Friday's Assocs.*, 88 B.R. 830, 840 (W.D. Tenn. 1988) ...................................... 31

*In re Moreau*, 135 B.R. 209, 215 (N.D.N.Y. 1992).......................................................................... 42

*In re North Plaza, LLC*, 395 B.R. 113, 120 (S.D. Cal. 2008).......................................................... 9

*In re Northlake Building Partners*, 41 B.R. 231, 234 (Bankr. N.D. Ill. 1984) ............................ 54

*In re O.H. Holding Co.*, 132 B.R. 568, 571 (Bankr. E.D. Mich. 1991)........................................ 33

*In re Offices and Services of* White *Plains Plaza, Inc.*, 58 B.R. 441, 443 (Bankr. S.D.N.Y. 1986) ..................................................................................................................... 13

*In re Poseidon Pool & Spa Recreational, Inc.*, 377 B.R. 52, 61 (Bankr. E.D.N.Y. 2007) ............................................................................................................................... 12

In *re Public Service Co. of New Hampshire*, 116 B.R. 347, 348 (Bankr. D.N.H. 1990) ........................................................................................................... 8, 42, 45, 53, 55

*In re Pyramid Operating Authority, Inc. v. City of Memphis*, 144 B.R. 795, 808 (Bankr. W.D. Tenn. 1992) .................................................................................................. 31

*In re Running*, 1990 WL 53063 (N.D. Ill.) .................................................................................... 10

*In re Sunflower Racing, Inc.*, 223 B.R. 222, 225 (D. Kan. 1998)................................................. 42

In *re Webb Mtn, LLC*, 2007 WL 4126016, *2 (Bankr. E.D. Tenn. Nov. 20, 2007) ..... 9, 40, 41, 42

*In the Matter of Triangle Labs., Inc.*, 663 F.2d 463 (3d Cir. 1981)........................................ 37, 38

*Jarboe v. Yukon Nat'l Bank (In re Porter)*, 54 B.R. 81, 82 (Bankr. N.D. Okla. 1985) ................................................................................................................................. 40

*Lauch v. Monning*, 15 Ohio App.2d 112, 239 N.E.2d 675 (1968) .......................................... 37, 38

*Maggiore v. Kovach*, 101 Ohio St.3d 184, 186, 803 N.E.2d 790, 2004-Ohio-722 {¶ 8} (2004) ............................................................................................................... 32

*Mark-It Place Foods, Inc. v. New Plan Excel Realty Trust* (4th Dist. 2004), 156 Ohio App.3d 65, 92-93, 2004-Ohio-411 {¶ 57}, 804 N.E.2d 979.................................... 39

*Michigan Coal. of Radioactive Material Users v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)............................................................................. 8, 9, 10, 11, 41, 44

*Midtown Apartments v. Davis*, 1985 WL 6004 (Ohio App. 10th Dist.) ........................................ 32

*Minor Metals, Inc. v. United States*, 38 Fed. Cl. 379 (1997)......................................................... 7

*Mohammed v. Reno*, 309 F.3d 95, 100 (2d Cir. 2002)................................................................... 44

*Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1212 (7th Cir. 1984), *cert. denied*........................ 31, 33

*Northfield Park Assocs. v. Northeast Ohio Harness*, 36 Ohio App.3d 14, 521 N.E.2d 466 (1987).............................................................................................................. 31

*Peppe v. Knoepp*, 103 Ohio App. 223, 140 N.E.2d 26 (1956) ..................................................... 34

*Quigg v. Mullins*, 1991 WL 59886 (Ohio Ct. App. 1991)............................................................. 31

*Rossi, McCreery and Assoc., Inc. v. Abbo (In re Abbo)*, 191 B.R. 680, 682 (Bankr. N.D. Ohio 1996) ........................................................................................................... 8, 41

*Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 953 (1974) ................................................. 41

*Southern Hotel Co. v. Miscott, Inc.*, 44 *Ohio* App.2d 217, 337 N.E.2d 660, 661 (10th Dist. 1975) .................................................................................................. 34, 37, 38

*Tabor v. Bellman*, 13 Ohio App 382 (1919) ................................................................................ 37

*United States v. Texas*, 523 F. Supp. 703, 729 (E.D. Tex 1981) .................................................. 7

*Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958) ............................................................................................................... 41

*Whitmore v. Meenach*, 33 Ohio Law Abs. 95, 99....................................................................... 37

*Zanetos v. Sparks* (1984), 13 Ohio App.3d 242, 244.................................................................. 35

## <u>Statutes</u>

11 U.S.C. § 362 .............................................................................................................. 14, 33

11 U.S.C. § 365 ................................................................ 11, 12, 13, 28, 30, 35

11 U.S.C. § 541 ................................................................................ 30, 33, 35

26 U.S.C. § 45 .................................................................................................. 52

H.R. 1424, Division B, Energy Improvement and Extension Act of 2008, Section
     101(a) ...................................................................................................... 52

O.R.C. § 1335.05 ............................................................................................. 39

Ohio Revised Code § 1.14 .............................................................................. 32

Ohio Revised Code § 1923.04 ........................................................................ 32

## <u>Other Authorities</u>

Rule 8005 of the Federal Rules of Bankruptcy Procedure ........................................................... 7

## EXHIBITS

A.    Affidavit of Jeffrey Bees dated February 5, 2009

B.    Affidavit of Peter Leidel dated February 11, 2009

C.    Partial Opinion on Motion of Debtor and Debtor-in-Possession for Approval of Assumption of the Unexpired Operating Lease Agreement With the City of Akron, filed April 25, 2008

D.    Opinion Re: Confirmation of Modified Second Amended Plan, dated January 26, 2009

E.    Memorandum Opinion Denying the City's Motion for Stay, dated February 10, 2009

F.    Operating Lease dated August 15, 2007, together with May 13, 1998 and April 1, 2005 Amendatory Agreements

G.    Second Amended Plan of Reorganization Dated July 14, 2008, as modified by (i) Debtor's Modifications to Second Amended Plan of Reorganization for Akron Thermal, Limited Partnership Dated July 14, 2008, filed September 10, 2008; (ii) Debtor's Supplemental Modifications of Proposed Second Amended Plan of Reorganization for Akron Thermal, Limited Partnership Dated July 14, 2008, filed September 26, 2008; and (iii) Agreed Order Resolving Objection to Confirmation Filed by the United States of America on Behalf of the United States Environmental Protection Agency, filed October 9, 2008.

H.    *In re Webb Mtn., LLC*, 2007 WL 4126016 (Bankr. E.D. Tenn. 2007)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **In re:** | : | |
| | : | |
| **AKRON THERMAL, LIMITED** | : | **Case No. 5:09MC-10** |
| **PARTNERSHIP,** | : | |
| | : | **Judge Oliver** |
| **Debtor and** | : | |
| **Debtor-in-Possession.** | : | |
| | : | |
| **CITY OF AKRON,** | : | |
| | : | |
| **Appellant,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **AKRON THERMAL, LIMITED** | : | |
| **PARTNERSHIP,** | : | |
| | : | |
| **Appellee.** | : | |

**MEMORANDUM OF AKRON THERMAL, LIMITED PARTNERSHIP IN
OPPOSITION TO THE CITY OF AKRON'S MOTION FOR STAY PENDING APPEAL**

On January 26, 2009, following months of contested proceedings and a lengthy confirmation hearing, the Bankruptcy Court entered a 63 page Opinion Re: Confirmation of Second Amended Plan (the "Confirmation Opinion"), and a separate Entry of Judgment (the "Judgment Entry").  Akron Thermal, Limited Partnership ("ATLP") is literally on the verge of consummating its Second Amended Plan of Reorganization dated July 14, 2008, as modified (the "Plan"), which would preserve over 40 jobs, result in payments to the City of over $2.5 million and payments to other creditors of over $3.5 million.  The City of Akron seeks to stop consummation of the Plan, jeopardizing the Plan itself, payments to creditors and the jobs the Plan will preserve.  As will be more fully explained below, the City's Motion for Stay should be denied.  Alternatively, if the Stay Motion is granted, the City should be required to post a

*supersedeas* bond in the amount of at least $37 million, which is the amount needed to protect ATLP, its creditors and others from the potentially irreparable harms that may result from the issuance of a stay.

## I.    BACKGROUND

ATLP is a regulated public utility which provides steam and hot water throughout the downtown Akron area.[1]  ATLP operates two generation plants and an 18 mile underground distribution system to provide these services to, among others, three hospitals in downtown Akron as well as the University of Akron.  ATLP leases the facilities from the City of Akron pursuant to an Operating Lease dated August 15, 1997.  A copy of the Lease (together with two amendments from 1998 and 2005) is attached hereto as Exhibit F.

ATLP filed its petition under Chapter 11 of the Bankruptcy Code on June 18, 2007. There have been a number of proceedings and issues heard by the Bankruptcy Code, but two items are of particular importance.  On October 15, 2007, ATLP filed a Motion of Debtor and Debtor-in-Possession for Approval of Assumption of the Unexpired Operating Lease Agreement With the City of Akron [Docket No. 206] and on October 16, 2007 ATLP filed a Motion of Debtor and Debtor-In-Possession for Approval of Assumption of Any and All License Agreements With the City of Akron and the Franchise Ordinance Ancillary to the Unexpired Operating Lease Agreement [Docket No. 208] (collectively, the "Motions to Assume").  The Bankruptcy Court presided over eight days of hearings on the Motions to Assume, and on April 25, 2008 issued a 43 page Partial Opinion on Motion of Debtor and Debtor-in-Possession for Approval of Assumption of the Unexpired Operating Lease Agreement With the City of Akron,

---

[1] Attached hereto as Exhibits A and B are Affidavits of Jeffrey Bees ("Bees Affidavit") and Peter Leidel ("Leidel Affidavit"), respectively.   The Bees Affidavit was filed with the Bankruptcy Court on February 5, 2009.  Attached hereto as Exhibits C, D and E are three Opinions from the Bankruptcy Court, more fully discussed herein.  Attached hereto as Exhibits F through H are other record items from the Bankruptcy Court and certain other items referenced herein.  If needed, ATLP can supply any of the other items referenced in this Memorandum.  Also ATLP reserves the right to supplement this Memorandum if there are further proceedings in this Court.

filed April 25, 2008 [Docket No. 390] (the "Partial Opinion").  A copy of the Partial Opinion is attached hereto as Exhibit C.

The second key item is ATLP's Plan of Reorganization.  ATLP filed a proposed Second Amended Plan of Reorganization, dated July 14, 2008.  Three amendments were thereafter filed, and references herein to the Plan means the Plan filed July 14, 2008, as modified.  Attached hereto as Exhibit G is a copy of the Plan (with the three modifications).

Under the Plan, on the Effective Date, Thermal Ventures II, L.P. ("TVII"), the majority owner of ATLP, will infuse $3 million of equity and make a $250,000 line of credit available to ATLP.  TVII will also waive substantially all of its claims against ATLP (in excess of $10 million).  ATLP will in turn pay over $2.5 million to the City to pay, in full, the entire cure obligation owed to the City of Akron.  The State of Ohio will be paid $1,500,000 for back gross receipts taxes ($150,000 on the Effective Date) and unsecured creditors will be paid approximately $2,040,000 (secured by a first lien on ATLP's assets).  ATLP will thereby complete a successful reorganization, preserving over 40 jobs, and continuing its service to its customers, most of whom have no back up source of steam for heat and other vital services.

The Plan was circulated to all creditors and parties in interest on July 28, 2008 and ballots were due on August 22, 2008.  On August 23, 2008, ATLP filed a Certification of Acceptances and Rejections of the Proposed Second Amended Plan of Reorganization [Docket No. 509] (the "Certification").  The results of the voting for those classes entitled to vote (and a brief summary of the treatment of those classes) are as follows:

| Class Name | Class Description | % of Ballots Voting to Accept | % of Amount Voting to Accept | Result | Treatment |
|---|---|---|---|---|---|
| 1.1 | Summit County | 100% | 100% | Accept | Payment of 100% per payment plan |

| 1.2 | University of Akron | 0% | 0% | Objection Settled and Withdrawn | Contract assumed and rights preserved |
|-----|---------------------|----|----|--------------------------------|---------------------------------------|
| 1.3 | Thermal Ventures II, L.P. | 100% | 100% | Accept | Claim waived except $75,000 |
| 1.4 | Other Secured Claims | N/A | N/A | N/A; No Creditors in this Class | N/A |
| 2.1 | State of Ohio Priority Claims | 0% | 0% | Agreed to Treatment | Payment of $1,500,000 (roughly 70% of claim) |
| 2.2 | Priority Claims (Other than the State of Ohio) | N/A | N/A | N/A; No Creditors in this Class | N/A |
| 3.1 | Unsecured Creditors at $5,000 or Below | 98.39% | 94.61% | Accept | 10% dividend within 90 days after Effective Date |
| 3.2 | Unsecured Creditors Over $5,000 | 92% | 16.07% | Reject | Pro rata share of $2,040,000, plus potential enhancements |
| 3.3 | Penalty Claims | 0% | 0% | Deemed Rejected | No payment |
| 4 | Equity Interests | 100% | 100% | Accept | TVII and Opportunity Parkway retain their interests; other interests extinguished |

Objections to confirmation were due on August 15, 2008 for the City and two others who had been active in the case, and August 22, 2008 for all other parties.  A total of five objections were filed, as follows:

1.  Objections of City of Akron to the Confirmation of the Second Amended Plan of Reorganization of Debtor and Debtor-in-Possession, Akron Thermal, Limited Partnership, filed August 15, 2008 [Docket No. 488] (the "City Objection");

2.  Objection of Ohio Edison Company to Confirmation of the Second Amended Plan of Reorganization of Debtor and Debtor-in-Possession, Akron Thermal, Limited Partnership, filed on August 20, 2008 [Docket No. 496];

3.  Objection of the United States, on Behalf of the United States Environmental Protection Agency, to the Second Amended Plan of Reorganization for Akron Thermal, Limited Partnership, filed on August 21, 2008 [Docket No. 497];

4.    The University of Akron's Limited Objection to Confirmation of Debtor's Second Amended Plan of Reorganization, filed on August 22, 2008 [Docket No. 505]; and

5.    Objection of Summa Health System to Second Amended Plan of Reorganization of Debtor and Debtor-in-Possession, Akron Thermal, Limited Partnership Dated July 14, 2008, filed on August 22, 2008 [Docket No. 507] (collectively, the "Objections").

ATLP resolved the above, except the City Objection.[2]  These are memorialized in the following:

1.    Agreed Order Resolving Objection to Confirmation Filed by the United States of America on Behalf of the United States Environmental Protection Agency, entered October 9, 2008 [Docket No. 536] (included as part of Exhibit G hereto);

2.    Agreed Order Resolving Objection of Summa Health System to Confirmation, entered October 9, 2008 [Docket No. 537];

3.    Agreed Order Resolving Limited Objection to Confirmation Filed by the University of Akron, entered November 13, 2008 [Docket No. 546].

Thus, out of the hundreds of creditors and parties in interest, the **only** creditor who continues to oppose the Plan is the City.  All other classes have either voted in favor of the Plan, or their objections have been resolved (or in the case of Ohio Edison, has not been pursued).

The Bankruptcy Court conducted nine days of hearings on the Plan during August through early October 2008.  *See* Confirmation Opinion at 9.  On January 26, 2009, the Bankruptcy Court issued its 63 page Confirmation Opinion confirming the Plan.  A copy of the Confirmation Opinion is attached hereto as Exhibit D.

---

[2] Ohio Edison did not participate in the confirmation hearing and was not a party to the Stay Motion in the Bankruptcy Court or in this Court.

On February 5, 2009, the last day for such action, the City of Akron filed a Motion for Stay Pending Appeal in the Bankruptcy Court.  The City provided no affidavits or other evidence to support its Motion for Stay.  On the same day, ATLP, the State of Ohio and the Official Committee of Unsecured Creditors all filed memoranda opposing the City's Motion.  On February 6, 2009, the Bankruptcy Court conducted a hearing on the Motion to Stay and on February 10, 2009, the Bankruptcy Court issued a 15 page Opinion denying the Motion to Stay. A copy of the February 10, 2009 Opinion is attached hereto as Exhibit E (the "February 10, 2009 Opinion").  The February 10, 2009 Opinion notes the total lack of evidentiary support for the Motion to Stay:

> Despite the explicit direction that the City could have taken from this controlling Six (sic) Circuit authority, the City presented no evidence at the Stay Hearing.  Rather, in a case where the Court heard evidence on 16 different days, the City asserted that evidence of irreparable harm to it could be found in the evidentiary record of the case.  In making this assertion, the City did not bother to direct this Court's attention to any particular evidence that had been admitted previously.  Thus, the City not only failed to carry its burden on this element, it made no effort to do so.

> \*       \*       \*

> This is yet another example of the City's total lack of evidentiary support for its Motion to Stay.

February 10, 2009 Opinion (Exhibit E hereto) at 9 and 15.[3]

The City now asks this Court to issue a stay to preclude ATLP from consummating the Plan and seeking to impose its will upon all of the other constituencies who favor the Plan.  For the reasons set forth below, the Stay Motion should be denied.

---

[3] The City now, belatedly, seeks to submit an Affidavit of Richard Merolla in its filings with this Court. Mr. Merolla's belated Affidavit should not be accorded any weight since it was not presented to the Bankruptcy Court.

## II.     **STANDARDS REQUIRED FOR ISSUANCE OF A STAY**

A stay pending appeal, similar to a preliminary injunction, is an "extraordinary" remedy, which should be "sparingly" granted only in limited circumstances.  *United States v. Texas*, 523 F. Supp. 703, 729 (E.D. Tex 1981).  *See also In re F.G. Metals, Inc.,* 390 B.R. 467, 471 (Bankr. M.D. Fla. 2008) (motion for stay "is an extraordinary remedy and requires a substantial showing on the part of the movant") (quoting *In re Lickman*, 301 B.R. 739, 742 (Bankr. M.D. Fla. 2003); *Acton v. Fullmer (In re Fullmer)*, 323 B.R. 287, 293 (Bankr. D. Nev. 2005), citing *Minor Metals, Inc. v. United States*, 38 Fed. Cl. 379 (1997).

Rule 8005 of the Federal Rules of Bankruptcy Procedure governs a request for stay pending appeal of a confirmation order.  That Rule provides, in relevant part, as follows:

> A motion for a stay of the judgment, order, or decree of a bankruptcy judge, for approval of a supersedeas bond, or for other relief pending appeal must ordinarily be presented to the bankruptcy judge in the first instance.  Notwithstanding Rule 7062 but subject to the power of the district court and the bankruptcy appellate panel reserved hereinafter, the bankruptcy judge may suspend or order the continuation of other proceedings in the case under the Code or make any other appropriate order during the pendency of an appeal on such terms as will protect the rights of all parties in interest.  A motion for such relief, or for modification or termination of relief granted by a bankruptcy judge, may be made to the district court or the bankruptcy appellate panel, but the motion shall show why the relief, modification, or termination was not obtained from the bankruptcy judge.  The district court or the bankruptcy appellate panel may condition the relief it grants under this rule on the filing of a bond or other appropriate security with the bankruptcy court . . .

The standards for obtaining a stay are well established.  To prevail, the City must establish the following:

    (1)    the likelihood that it will prevail on the merits of the appeal;

    (2)    that it will be irreparably harmed absent a stay;

    (3)    that others will not be harmed if the court grants the stay; and

(4)     the public interest favors granting the stay.

*Michigan Coal. of Radioactive Material Users v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)(applying above standards under Rule 8(a), Fed. R. App. P.); *In re Level Propane Gases, Inc.*, 304 B.R. 775, 777 (Bankr. N.D. Ohio 2004); *In re Dow Corning Corp.*, 255 B.R. 445, 542 (E.D. Mich. 2000); *Rossi, McCreery and Assoc., Inc. v. Abbo (In re Abbo)*, 191 B.R. 680, 682 (Bankr. N.D. Ohio 1996); *In re Baldwin United Corp.*, 45 B.R. 385, 386 (Bankr. S.D. Ohio 1984). Each of these will be discussed more fully in Part III below.

The City bears the burden of proving these elements by a preponderance of the evidence. *Level Propane Gases,* 304 B.R. at 777. Moreover, the City "must address each factor, regardless of its relative strength, providing specific facts and affidavits supporting assertions that these factors exist." *Griepentrog*, 945 F.2d at 154 (emphasis added).

The same four part test applies in connection with a motion to stay a confirmation order. *See In re F.G. Metals, Inc.*, 390 B.R. 467, 471-72 (Bankr. M.D. Fla. 2008). *In re Adelphia Communications Corp.*, 368 B.R. 140, 282-83 (Bankr. S.D.N.Y. 2007); *In re Adelphia Communications Corp.*, 361 B.R. 337, 346 (S.D.N.Y. 2007); *Dow Corning*, 255 B.R. at 542; In *re Public Service Co. of New Hampshire*, 116 B.R. 347, 348 (Bankr. D.N.H. 1990); *In re Dakota Rail, Inc.*, 111 B.R. 818, 820 (Bankr. D. Minn. 1990).

## III.  THE MOTION SHOULD BE DENIED BECAUSE THE CITY HAS FAILED TO SATISFY THE NECESSARY CRITERIA FOR A STAY PENDING APPEAL

### A.     The City Has Not Demonstrated a Likelihood of Success on the Merits

A movant seeking a stay pending appeal of a trial court's judgment after a trial on the merits "will have greater difficulty in demonstrating a likelihood of success on the merits." *Griepentrog*, 945 F.2d at 153. *See also* In *re Webb Mtn, LLC*, 2007 WL 4126016, *2 (Bankr.

E.D. Tenn. Nov. 20, 2007) (a copy of this unreported decision is attached as Exhibit H).  The

Sixth Circuit explained as follows:

> Although the factors to be considered are the same for both a preliminary injunction and a stay pending appeal, the balancing process is not identical due to the different procedural posture in which each judicial determination arises.  Upon a motion for a preliminary injunction, the court must make a decision based upon "incomplete factual findings and legal research." . . . Even so, that decision is generally accorded a great deal of deference on appellate review and will only be disturbed if the court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard. . . .
>
> Conversely, a motion for a stay pending appeal is generally made after the district court has considered fully the merits of the underlying action and issued judgment, usually following completion of discovery.  As a result, a movant seeking a stay pending review on the merits of a district court's judgment will have greater difficulty in demonstrating a likelihood of success on the merits.  **In essence, a party seeking a stay must ordinarily demonstrate to a reviewing court that there is a likelihood of reversal.**  Presumably, there is a reduced probability of error, at least with respect to a court's findings of fact, because the district court had the benefit of a complete record that can be reviewed by this court when considering the motion for a stay.

*Griepentrog*, 945 F.2d at 153 (citations omitted, emphasis added).

Assertions by the City that "are not backed up by any substantial proof, but instead are

'speculative and theoretical'" are insufficient to establish the likelihood of reversal.  *Webb Mtn,*

*LLC*, 2007 WL 4126016, *3 (citing *Griepentrog*, 945 F.2d at 154).  *See also In re North Plaza,*

*LLC*, 395 B.R. 113, 120 (S.D. Cal. 2008) (movant must show it is "more likely than not they will

succeed on the merits, whatever the possibility of irreparable injury").

Demonstrating likelihood of success is particularly difficult where, as here, many of the

issues raised by the City are factual issues which are subject to the clearly erroneous standard of

review.  As one court has observed:

> The length of the Memorandum Decision is indicative of the factually intensive nature of the confirmation hearing, and the appeal almost exclusively raises issues regarding the accuracy of factual determinations made therein. The Court's findings of fact must be sustained on appeal unless the reviewing court concludes that they were "clearly erroneous." . . . The reviewing court must accept the findings unless it is left with a "definite and firm conviction that a mistake has been committed." . . . Of particular importance to my decision to confirm the Mills/Hughes Plan was my assessment of the lack of credibility of the RRA's witnesses and the credibility of the witnesses testifying on behalf of Hills/Hughes. Such assessments of credibility are especially entitled to deference on review:
>
>> Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.
>
> Fed. R. Bankr. P. 8013. Consequently, there is little chance that Ross and the RRA will prevail in their challenges to my findings of fact.

*Dakota Rail,* 111 B.R. at 820-21 (citations omitted).

Because a stay pending appeal is an extraordinary remedy, the City is required to make a substantial evidentiary showing that the applicable factors weigh in its favor. *Lickman*, 301 B.R. at 742 (citing *In re Running*, 1990 WL 53063 (N.D. Ill.); *Griepentrog*, 945 F.2d at 154. The City made no evidentiary showing at the Bankruptcy Court on this issue, and has not made a proper showing to this Court.

The evidence presented in this case overwhelmingly suggests that the City will not succeed on the merits. The Bankruptcy Court presided over eight days of testimony in connection with the Motions to Assume, and over eight days of testimony in connection with confirmation. The City sets forth six issues as to which it contends it is likely to prevail on appeal. Stay Motion at 13-27. Every one of these issues was fully briefed and considered by the Bankruptcy Court. Many of the issues are factual in nature, and there is ample evidence to

support every factual finding by this Court.  As noted in *Griepentrog*, since there has been a full and fair trial on the merits, the Bankruptcy Court's findings are to be upheld unless "clearly erroneous," with due weight given to the Bankruptcy Court's ability to judge the credibility of the witnesses.  ATLP will briefly address each alleged issue.  This Court should also be aware that the City raised only five of these six issues to the Bankruptcy Court in connection with the Motion to Stay, and the Bankruptcy Court addressed each of them in the February 10, 2009 Opinion.  *See* Exhibit E hereto at pages 5-9.

### 1.  <u>Embedding of Lease Assumption into Confirmation Process</u>

The City's contentions in paragraphs 46 to 51 of its Stay Motion that the Bankruptcy Court's ruling on assumption of the Lease should not have been embedded within confirmation of the Plan, are without any support.  The City has no likelihood of succeeding on the merits of this issue on appeal.  All that ATLP was required to do within the initial 120-day period set by 11 U.S.C. § 365(d)(4) was decide to assume the Lease and give the City notice of the same by filing and serving the Assumption Motion.  *See, In re Burns Fabricating Co.*, 61 B.R. 955, 956 (Bankr. E.D. Mich. 1986) ("[i]t is clear then that the 60-day period of section 365(d)(4) refers to the time in which the trustee or debtor must decide to assume or reject, and not the time in which the entire process must be completed.") (emphasis in original).  *See also, In re Delta Paper Co., Inc.,* 74 B.R. 58, 59-60 (Bankr. E.D. Tenn. 1987) (holding that "the trustee assumes or rejects the lease within the meaning of section 365(d)(4) when he makes up his mind to do so and communicates his decision in an appropriate manner, such as by filing a motion to assume[;]" "court approval of the assumption is not required within the 60-day period.") (citing *By-Rite Distrib., Inc. v. Brierley (In re By-Rite Distrib., Inc.*), 55 B.R. 740 (D. Utah 1985) (holding that under the old section 365(d)(1) "it was settled law that the sixty-day limit . . . applied only to the trustee's decision to assume, not to the court's approval of that decision.") (citations omitted)).

The 120 day period under section 365(d)(4) is the only time-limit found in the current Bankruptcy Code regarding ATLP's obligation to act, yet the City acts as if there was a deadline in the Bankruptcy Code for the Bankruptcy Court to issue a final ruling on the Motions to Assume.

The City's repeated attempt to characterize the Bankruptcy Court's decision to issue a final ruling on the Motions to Assume within the plan confirmation context as an improvident extension of time for ATLP to assume the Operating Lease is a red herring.  The statutory period in Section 365(d)(4) limits the time for ATLP to file the Motions to Assume, but does not limit the time for the Bankruptcy Court to consider the motion.  *See, In re Poseidon Pool & Spa Recreational, Inc.*, 377 B.R. 52, 61 (Bankr. E.D.N.Y. 2007) ("[T]he time limits of § 365(d)(4) are intended to limit the actions of the debtor or trustee, but not those of the court."); *Delta Paper*, 74 B.R. at 59-60; *By-Rite*, 55 B.R. 740.  ATLP timely did all that it was required to under Section 365(d)(4).

The core of the City's misguided argument is that the Bankruptcy Court somehow violated the Bankruptcy Code by putting assumption of the Lease and confirmation of the Plan on the same track.  It is correct that Section 365(d)(4), under BAPCPA, was revised to remove perpetual extensions of a debtor's decision to assume a lease, but this has nothing to do with the time that a Bankruptcy Court needs to consider and issue a ruling on assumption of a lease.  The City cites no support for the proposition that the Bankruptcy Court had to rule on the Motions to Assume prior to confirmation of the Plan.  Instead, the City attempts to manufacture, out of whole cloth, the conclusion that bankruptcy courts have found that deciding assumption issues within the plan confirmation process is contrary to the intent of Congress.  (*See,* Stay Mot., p. 15-16, ¶¶ 48-50.)

The one case that the City cites to supposedly support its misguided argument, *In re Offices and Services of* White *Plains Plaza, Inc.*, 58 B.R. 441, 443 (Bankr. S.D.N.Y. 1986) is wholly inapplicable.  The one paragraph from this case that the City cites in paragraph 48 of its Stay Motion, involved a completely different circumstance and it cited a proposition from case law dealing with the 1978 version of the Bankruptcy Code.  In the cited case, the bankruptcy court had denied the debtor's motion to assume a lease prior to consideration of the plan because the debtor had failed to offer to cure amounts owed on a promissory note.  *See* 58 B.R. at 442. Thereafter, the debtor attempted to assume the lease through the plan, at which time the Court considered the issue of whether a cure under Section 1124 of the Bankruptcy Code can supersede a cure under Section 365(b).  *See* 58 B.R. at 442-43.  This was a completely different circumstance in which the Court had already rule upon the assumption motion.  Moreover, the language cited by the City was taken from the 1978 Bankruptcy Code context in which debtors were ordinarily permitted to assume a lease or executory contract at any time up until plan confirmation, which has since been removed.  *See, In re Cook United, Inc.*, 53 B.R. 342, 345 (Bankr. N.D. Ohio 1985).

In this case, the Bankruptcy Court made its final ruling upon the Section 365 issues raised by the Motions to Assume at the same time it confirmed the Plan because the two matters were so "inextricably intertwined."  *See* Partial Opinion (Exhibit C hereto) at 3.  Accordingly, the language from the *In re Offices and Services of White Plains Plaza, Inc.* case has no bearing and does not, in any way, support the City's assertions on this issue – that the Bankruptcy Code requires assumption to occur prior to confirmation in all cases.

Finally, in its February 10, 2009 Opinion, the Bankruptcy Court dealt with this argument:

> The final issue identified by the City is based upon a contorted reading of § 365(d)(4)(A).  The City confuses the

> deadline for a debtor to seek authority to assume a lease with the time that a court may reasonably take in the circumstances of a particular case to determine the issue. The City is correct that this Court was unwilling to tolerate delay in the Debtor's initial action in considering whether it would and could assume the Lease. The City's argument simply ignores the discretion that bankruptcy courts must have in managing their dockets. The deadline in § 365(d)(4)(A) is not a deadline for the court's determination of this issue. *Compare* 11 U.S.C. § 362(e). This issue does not add any weight to the City's case for a stay pending appeal.

February 10, 2009 Opinion at 8-9. The City has no chance of success on appeal of this issue.

### 2.   Environmental Issues

ATLP operates five boilers, including boiler 32, a 220 million Btu/hr coal-fired boiler that was constructed by the BF Goodrich Company (BFG) in 1967, prior to the enactment of the Clean Air Act.[4]  In 1988, when BFG closed its tire manufacturing plant (and deactivated boiler 32), it deeded the boiler (and assigned its corresponding Ohio EPA air pollution operating permit) to the City of Akron.

On June 14, 1995, while Debtor was negotiating with the City to take over the operation of the boiler system, the City received confirmation from Ohio EPA, in response to **the City's** request to allow the reactivation of boiler 32, that the unit would only be required to comply with the terms and conditions of its current permit, i.e., the 1988 Notice of Registration.  A subsequent letter from the Akron Air Agency[5] stated that the registration status would cover boiler 32 until the (new) permit program, Title V of the federal Clean Air Act, was implemented. On August 4, 1995, the City entered into an Interim License and Operating Agreement with the Debtor to operate the boiler system, including boiler 32, and assigned to Debtor the corresponding Ohio EPA air pollution operating permit.

---

[4] Units in existence when the Clean Air Act was enacted are treated differently than new units or major modifications of existing units that occurred after its enactment.

[5] The Akron Air Agency is retained by Ohio EPA to implement air pollution control rules and permitting in Medina, Portage and Summit counties.

On September 30, 1996, ATLP applied for a Title V permit from Ohio EPA for all five operating boilers, including boiler 32.  The Ohio EPA process for issuing major air emission source Title V permits is multi-phased: it begins with a draft permit, followed by a preliminary proposed permit, then a proposed permit, and finally a final permit.  The purpose of this multi-step process is to provide the applicant, the public and U.S. EPA the opportunity to review and comment on—and in the case of U.S. EPA to object to—the permit before it is issued.  The Title V operating permit, when finally issued, is enforceable by Ohio EPA as well as U.S. EPA.

At every step of the permit process, the emissions limitations for boiler 32 were based on it being an existing source (*i.e.*, the same as were in effect when the boiler was last operated in 1988): 0.158 lbs/mmBtu particulate matter (PM); 7.0 lb/mmBtu for sulfur dioxide; no limitation on the emission of nitrogen oxides.  U.S. EPA never raised any objection to these permit limits, did not suggest that boiler 32 had to install best available control technology (BACT) or otherwise comply with the new source performance standards (NSPS) or prevention of significant deterioration (PSD) regulations, and the permit was issued as final on February 4, 1999.

The initial Title V permit expired on February 4, 2004.  In accordance with the permit terms, ATLP submitted a renewal application on March 28, 2003, which was processed by Ohio EPA (and the Akron Air Agency) in the same manner as the original permit:  draft, preliminary proposed, proposed and final.  As was the case with the original permit, the renewal authorized boiler 32 as an existing source, with the same emissions limitations. Again, U.S. EPA did not object to, or otherwise comment on the emissions limitations.  The permit became final on January 30, 2004.  Between 1995 (when boiler 32 was reactivated) and 2005, emissions from

boiler 32 were in substantial compliance with all emission limitations contained in the Title V permits.[6]

U.S.EPA's Notice of Violation Regarding Boiler 32

On February 15, 2005, after approving without comment the emission limits in the 1999 and 2004 Title V permits, U.S. EPA abruptly changed its mind about the status of boiler 32, and sent a Notice of Violation (NOV) to ATLP.  The NOV stated that U.S EPA now considered boiler 32 to have been a modified or "new" source when it resumed operation in 1995, and therefore subject to New Source Performance Standards and Prevention of Significant Deterioration regulations.  If true, the boiler would be required to install BACT.

ATLP's response to the February 15, 2005 NOV

ATLP has contested and continues to dispute the merits of the February 15, 2005 NOV. The U.S. EPA contends that even though boiler 32 was installed in 1967, before the Clean Air Act was adopted, it is a "new source" because it was not operated between 1988 and 1995. ATLP can make a compelling case that U.S. EPA is simply wrong in concluding that ATLP's resumption of operation of boiler 32 in 1995 constituted the operation of a "new source" or the modification of an existing source that triggered an obligation to install BACT.  In the absence of a financially viable settlement with U.S. EPA regarding the definition of BACT for boiler 32, ATLP intends to contest the issue.

Status of ATLP's Negotiations with U.S. EPA

ATLP's representatives last met with representatives of U.S. EPA on August 7, 2008 and, based on that meeting and discussions thereafter, the prospects for agreement upon appropriate control measures for boiler 32 appear promising.  On September 5, 2008, ATLP, the United

---

[6] ATLP timely renewed the January 30, 2004 Title V permit before it expired in January 2009 and remains in substantial compliance with all emission limitations.

States, on behalf of U.S. EPA, and the Committee of Unsecured Creditors, filed a proposed Agreed Order Resolving Objection to Confirmation Filed by the United States of America on Behalf of the United States Environmental Protection Agency (EPA Agreed Order), which fully resolves the civil penalty claims in the NOV.  That Order was entered on October 9, 2008 and is a part of Exhibit G hereto.  Although the EPA Agreed Order fully resolves U.S. EPA's potential civil penalty claims against the ATLP, it does not resolve the U.S. EPA's separate demand for operational changes at boiler 32.

<u>City of Akron Notice of Violation from U.S. EPA</u>

On September 17, 2008, the City of Akron received a Notice of Violation from U.S. EPA, which was essentially the same as the February 15, 2005 NOV issued to the ATLP except that it did not include a demand for civil penalties.  Procedurally, because the City is the owner of boiler 32, U.S. EPA needed to issue a NOV to the City in order to resolve the NOV with the ATLP, who is the operator of Boiler 32.

<u>ATLP's Environmental Obligations Under its Lease with the City of Akron</u>

ATLP's environmental obligations are governed by the express terms of the Operating Lease.  During the hearings on the environmental issues in this case, the City tortured these terms to advance the argument that the U.S. EPA's issuance of a NOV to the Debtor in February of 2005 was a breach of the Lease and that the City had been "damaged" by this breach.  Neither is true.  The Bankruptcy Court held that the City's revisionist construction of the Lease is not supported by basic contract law or the facts of this case.  In its Stay Motion, the City offers nothing new; it simply regurgitates the same contorted arguments it unsuccessfully advanced below.

The NOV for Boiler 32 does not create any current environmental obligation for ATLP under the Operating Lease.  As the Bankruptcy Court noted at page 41 of the Partial Opinion:

> No legal consequences flow from the issuance of [an] NOV because it merely notifies [a company] of their [sic, its] existing obligations under the CAA [Clean Air Act].  It does not impose any new obligations or penalties on [a company], and does not even direct or request that [the company] correct the alleged violations.  In order to compel action or impose penalties, EPA would have to pursue further enforcement action, at which time [the company] would have an opportunity to raise [its] defenses…. Absent such action, the findings and conclusions in the NOV have no direct and immediate . . . effect on the day-to-day business of [the company]."  *Royster-Clark Agribusiness v. Johnson, Administrator, U.S. EPA*, 391 F. Supp. 2d 21, 2005 U.S. Dist. LEXIS 18918 (D.C. August 29, 2005), at fn 16 (Internal quotes and citations omitted.)

Moreover, under Section 4.2 of the Operating Lease, ATLP has an absolute right to contest the NOV and USEPA's allegation that additional air pollution control equipment should be installed on Boiler 32.

> "Tenant . . . shall comply with all laws, rules, regulations, orders, and other requirements applicable to the Leased Property imposed by any Governmental Authority having jurisdiction with respect thereto, including, without limitation, those pertaining to the condition of the environment (collectively, "Applicable Legal Requirements").  **Notwithstanding any provision of this Lease to the contrary, Tenant may, but shall not be obligated to, contest any Applicable Legal Requirements by appropriate proceedings duly instituted and diligently prosecuted at Tenant's expense** . . . . " (Emphasis added.)

In short, as the Court found below, the City has not demonstrated that it is likely to prevail on this issue.

### 3.      ATLP has Properly Maintained the Facility

The City now claims that it is likely to prevail on matters concerning maintenance at the premises.  The City **did not** make this argument when seeking a stay from the Bankruptcy Court. As a result, it should not be permitted to do so now.  Nevertheless, should this Court entertain

this new argument, the City does not demonstrate a probability of success on the merits of its appeal based upon ATLP's maintenance of the Leased Property.  In its Stay Motion, the City takes issue with the factual findings made by the Bankruptcy Court with respect to ATLP's maintenance of the Leased Property.  Accordingly, the City must demonstrate that the Bankruptcy Court's findings of fact with respect to maintenance were clearly erroneous.  The City is unable to meet this standard.

### i.        ATLP's Repair of the Roof at the RES Plant.

The City argues that ATLP has failed to maintain the roof at the RES Plant consistent with the terms of the Lease, and that the cost to cure this default totals $380,000.  In the Confirmation Opinion, the Bankruptcy Court determined that the City failed to establish a default of the Lease based upon the condition of the roof at the RES plant.  The Court concluded that evidence in the record established that the roof had been repaired consistent with ATLP's obligations under the Lease, and that if the roof was required to be repaired, only an additional $75,000 was required to make repairs to the roof.  Confirmation Opinion (Exhibit D hereto) at 24, 29-32.  The record supports the Bankruptcy Court's findings.

Section 11 of the Lease (Exhibit F hereto), entitled "Damage and Destruction," governs the Debtor's obligations with respect to the roof at the RES Plant.  Section 11 of the Lease does not impose an obligation upon ATLP to replace as new any part of the Leased Property which has been damaged as a result of an October 13, 2000 fire.  Section 11 merely requires ATLP to provide a functional replacement of any Leased Property damaged by a fire for purposes of continuing its services.  (*See* Lease, Section 11, p.10).

On July 16, 2001, Tri-State Restoration, Inc. ("Tri-State") issued a quote to ATLP for all of the work required to completely replace the roof and repair the building damage which

occurred as a result of the 2000 Fire (the "July 16 Quote").  Tri-State quoted the entire project at $380,000.  (*See*, City Exhibit J, Bates No. 8064-8066.)

Mr. Richard Karlis, the president and sole owner of Tri-State, testified as a witness for the City during the confirmation hearing.  Mr. Karlis testified that Tri-State performed some of the work set forth in the July 16 Quote and that Tri-State was paid for all of the work it performed and all of the materials it supplied to the project.

Mr. Pucak, the Debtor's general manager, testified that the repairs to roof made by Tri-State in 2001 and some minor repairs made by ATLP's employees on or around that time made the roof functional.  Mr. Pucak testified that the condition of the roof at the RES Plant as it existed after Tri-State made repairs as a result of the 2000 Fire did not prevent ATLP from producing steam and distributing that steam to its customers.  Mr. Pucak further testified that the roof remains functional today; and that since the repairs were made to the damages that resulted from the 2000 Fire, ATLP has been able continuously to produce steam and to distribute that steam to its customers.

As to any further costs to repair the roof,  Mr. Karlis testified that on September 24, 2001, Tri-State issued a second quote to the Debtor for repairs to the roof at the RES Plant (the "September 24 Quote").  A copy of the September 24 Quote was identified as Debtor's Exhibit 37 and was admitted into evidence.  (*See,* Debtor's Exhibit 37.)  Mr. Karlis testified that the September 24 Quote contained work which was included as part of the July 16 Quote, and had yet to be performed.  In the September 24 Quote, Tri-State quoted the remaining work necessary to repair the 2000 Fire damage at the RES Plant roof at $145,268.  (*See*, Debtor's Exhibit 37.)

Mr. Karlis then testified that  on September 8, 2008, Tri-State issued another quote at the City's request for all roof and building repairs at the RES Plant (the "September 8 Quote").  (*See,*

City's Exhibit T.)  The September 8 Quote for the repair the roof and building at the RES Plant was $800,000, but was conditioned on eleven (11) separate "unknowns."  Mr. Karlis admitted that he did not consider himself to be an "expert" on the issues before the Court, and further testified that because of the eleven (11) "unknowns" which were stated in the cover letter to his September 8 Quote, his estimate to complete the roof repairs at the RES Plant was no more than a "mere guess."

The City also introduced the expert testimony of Dale Conley with respect to the cost of ATLP's on-going maintenance.  (See, *Dale Conley Testimony,* Tr. 1/31/08 at p. 59.).  Mr. Conley submitted a report of his work to the City of Akron in April 2007.  (See, *Dale Conley Testimony,* Tr. 1/31/08 at p. 62.).  Mr. Conley issued his updated report in November 2007 (the "Conley Expert Report").  (See, *Dale Conley Testimony,* Tr. 1/31/08 at p. 95.)  In his report, Mr. Conley opines the costs of repairing the roof at the RES Plant at $75,000.  (*See,* City's Assumption Ex. LLLL, Tab 2, p 12 of 26.)

Richard Pucak, ATLP's General Manager testified that, based upon quotes he had received for the repair of the roof, that the costs of repairing the entire roof at the RES Plant was between $75,000 and $125,000.  The cost estimates received by Mr. Pucak, and upon which he based his trial testimony, are for repairs to the entire roof at the RES Plant, not just parts of the RES Plant roof that were damaged as a result of the 2000 Fire.  Mr. Pucak testified that there is more than enough money in the budget for any work which would need to be performed.

The Court's findings as to ATLP's obligations to repair the roof at the RES Plant are not clearly erroneous.  Section 11 of the Lease provides that, as a result of the 2000 Fire, ATLP is to provide a functional replacement of the roof at the RES Plant.  Evidence before the Bankruptcy Court supports the Court's factual findings that ATLP has provided a functional replacement of

the roof because ATLP has continued to produce steam and deliver that steam to its customers since the repairs to the roof were made. In addition, evidence in the record demonstrates that should additional repairs to the roof be required, these repairs would cost only $75,000; an amount ATLP is able to pay to make the repairs. Because there is evidence in the record to support the Bankruptcy Court's findings on this issue, these findings are not clearly erroneous and the City is unable to demonstrate a probability of success on the merits of its appeal.

### ii.    ATLP Has Properly Maintained the Condensate Return Line

The City further asserts that ATLP has not maintained the condensate return line which runs from Akron City Hospital to The University of Akron, and that this alleged failure to maintain the condensate return line is a breach of the Lease.

Section 9 of the Lease, entitled "Maintenance of the Leased Property," provides that the Debtor is responsible for and shall pay the cost of all maintenance of the System and the Leased Property. (*See* Lease, Section 9, p. 8-9). Section 9 of the Lease does not impose an obligation upon ATLP to improve or replace the Leased Property. Section 9 requires ATLP to maintain the System and the Leased Property.

On the issue of the condensate return line, the City introduced expert testimony of Leonard J. Bacha and Walter T. Young, both employees of Corppro Companies, Inc. ("Corppro"). Mr. Bacha testified that the City retained Corppro to evaluate the condition of the cathodic protection system installed as part of the steam distribution system. Mr. Bacha and Mr. Young testified that the system as designed required some method of cathodic protection to prevent the steel manholes and distribution pipe from corroding. Mr. Young testified that if cathodic protection was not provided or if the installed cathodic protection system failed to properly function, the steam distribution system and condensate return line would "immediately" begin to corrode.

In their joint expert report, Mr. Bacha and Mr. Young indicated that the cathodic protection system installed as part of the Leased Property was installed during construction of the steam system in 1978, and that it was designed for a 15-20 year life span. Mr. Bacha testified that on the morning of August 13, 2008, the City provided him with a copy of the last cathodic protection survey conducted for the City in June 1992 by Ricwil Piping System Services (the "Ricwil Report"). (*See*, City's Exhibit I).

At the confirmation hearings, Mr. Bacha and Mr. Young, testified that, based upon the Ricwil Report, the cathodic protection system which was installed during the construction of the steam system in 1978 was not operating in June 1992. The 1992 report makes the following conclusion:

CONCLUSION

CATHODIC PROTECTION

The cathodic protection system with the exception of the readings taken at manhole #1 and Test Station #7 at High and Center Street, is ineffective. The potentials are below the accepted standard of (-)0850 millivolts. The current readings recorded during this survey and past surveys indicate the anodes are being used at a high rate and there is no longer enough driving potential to effectively protect the conduit from external corrosion.

(*See*, City Ex. I, p 2.00). Mr. Bacha and Mr. Young also testified that the Ricwil Report concluded that, as of June 19, 1992, manhole numbers 4A, 5, 9 and 13 were severely corroded through the interior of the manholes. (*See*, City Ex. I, p 3.01-3.02.). Mr. Young further testified that based upon the Ricwil Report, the useful life of the cathodic protection system was less than the normal useful life of 15 years. The City offered no evidence that it made any effort to repair or replace the cathodic protection system prior to 1997.

Mr. Pucak, ATLP's General Manager, also testified about the repairs to the high pressure steam condensate return line. (*See Richard Pucak Testimony*, Tr., 2/19/08 at p. 680-684, 700-

701.)    Mr. Pucak testified that the best method of repairing the condensate return line was by "sleeving" 3" pipe though the damaged 5" steam condensate return line already in place, and installing drains into the manholes which were installed as part of the Ricwil System.  (*See Richard Pucak Testimony*, Tr., 2/19/08 at p. 680-681.)  Mr. Pucak testified, based upon his experiences with steam distribution systems, that "sleeving" is an acceptable method of repair in the steam distribution industry.  Mr. Pucak also testified that City Hospital was aware that the Debtor was "sleeving" to make repairs to the condensate return line, and that it had not objected to this method of repair.  Mr. Pucak testified that the sleeved 3" pipe was of a sufficient capacity to allow City Hospital to return its usual volume of condensate back to ATLP.  Mr. Pucak also testified that the "sleeving" repairs would last between ten and fifteen years.

Based upon the evidence, the Court determined that ATLP was adequately maintaining the condensate return line as is required in the Lease.  Evidence in the record established that, as of 1992, the cathodic protection system installed with the steam distribution lines was not operational, and that condensate return line was corroded well before ATLP executed the Lease. Further, the evidence supports a finding that ATLP's efforts to repair the condensate return line meet the standards of maintenance set forth in the Lease.  The City is unable to demonstrate that the Court's factual findings are clearly erroneous because they are supported by evidence in the record.  The City cannot demonstrate a likelihood of success on the merits of this issue.

### iii.    ATLP Has Properly Allocated Money for Future Maintenance.

The Bankruptcy Court determined that ATLP has allocated sufficient sums of money in its annual budget to pay for the costs of maintaining the Leased Property.  Without citing to any evidence in the record, the City contends that the Court's finding is simply wrong, and that it has a probability of success on this issue because the Bankruptcy Court erred in reaching this finding of fact.  However, as with the other maintenance issues raised by the City in its Stay Motion,

evidence in the record supports the Court's findings. The City cannot demonstrate a probability of success on the merits of this issue.

Mr. Pucak testified that during the years 2005-2007, inclusive, ATLP has spent no less than $2.25 Million annually to maintain the Leased Premises. (*See Richard Pucak Testimony*, Tr., 2/19/08 at p.689-692; Debtor's Ex. 108.). The money spent by ATLP was used to pay for capital improvements, major maintenance, routine maintenance on the equipment located at the facility and the labor to maintain the System and the Leased Property. (*See Richard Pucak Testimony*, Tr., 2/19/08 at p. 689-692; Debtor's Ex. 108.). For calendar year 2008, ATLP has established a maintenance budget which is approximately $2.8 million; more money than what was spent on maintenance in prior years. (*See*, Debtor's Ex. 1, p. 53.).

In is expert report, Mr. Conley, the City's maintenance expert, opines that ATLP's maintenance employees have done "a wonderful job" maintaining the facility, and that the Debtor's employees are "very diligent and work very hard." (*See Dale Conley Testimony*, Tr., 1/31/08 at p. 130, lines 12-14; p. 171, lines 17-18.) He testified that the he is in "admiration" of the maintenance work that ATLP's employees perform upon the facilities. (*See Dale Conley Testimony*, Tr., 1/31/08 at p. 170, lines 17-20.)

In the Partial Opinion, the Bankruptcy Court found, based upon the testimony of witnesses at the January 31, 2008 and February 19, 2008 hearings, that the estimated maintenance costs for 2008 would be $1.65 Million; an amount which is less than the amount that ATLP has spent in prior years for maintenance and an amount less that has been budgeted for maintenance in 2008. (*See,* Partial Opinion*, p. 15, ¶ 36.). In his report and testimony before the Bankruptcy Court, Mr. Conley opined that the amount required to be spent by ATLP to maintain the Leased Premises from 2008 through 2012, would be less than $600,000 per year.

(*See* City's Ex. LLLL, Tab 1, p. 25 of 26).  This amount is also less than what has been budgeted by ATLP to perform yearly maintenance at the Leased Premises.

Evidence in the record supports that ATLP will be able to maintain the Leased Premises for the entire term of the Lease.  The evidence demonstrates that ATLP has maintained the facility and that it has budgeted sufficient sums to allow it to properly maintain the facility in future years.  According, there is an abundance of evidence in the record to support the Bankruptcy Court's findings of fact regarding ATLP's maintenance of the Leased Premises; the Bankruptcy Court's findings are not clearly erroneous.  The City has not demonstrated a likelihood of success on the merits of this appeal relating to ATLP's maintenance of the Leased Premises.

### 4.  Extension of Lease

The matters related to the extension of the Lease were exhaustively briefed and considered by the Bankruptcy Court.  The Bankruptcy Court addressed every aspect of this issue in both the January 31, 2008 oral decision and the Partial Opinion.  The City cannot show that it is likely to prevail on this issue.

Section 2 of the Lease provides, in full, as follows:

> Section 2.  Term.  The term (the "Term") of this Lease shall commence on the date of this Agreement (the "Lease Closing Date").  The initial term of this Lease shall be for ten (10) years commencing on the Lease Closing Date and Tenant shall have the right to renew and extend the initial term for one additional period of ten (10) years.  The Term shall end on the earlier to occur of (a) the Purchase Closing Date or (b) the tenth anniversary of the Lease Closing Date or in the event that the Tenant has elected to extend the term for an additional ten (10) years, on the twentieth anniversary of the Lease Closing Date, unless earlier terminated pursuant to the provisions of this Lease.

The Lease also contains integration and severability clauses:

Section 22. <u>Entire Contract</u>. This Lease, together with the Schedules hereto, the Purchase Agreement and the other related agreements referred to herein or therein, is the entire contract between the parties relating to the subject matter hereof, and supersedes all prior and contemporaneous negotiations, understandings, and agreements, written or oral, between the parties and, specifically, the Interim Agreement is hereby terminated and superseded by this Lease and the Purchase Agreement.

\*   \*   \*

Section 28. <u>Severability</u>. Each article, section, subsection, and lesser section of this Lease constitutes a separate and distinct undertaking, covenant, and/or provision hereof. . . .

There is nothing in section 2 or any other section of the Lease which conditions extension of the lease term. Ohio law is settled that where parties have reduced their agreement to a writing, including an integration clause, courts should not add new terms. Adding new conditions violates sections 2, 22 and 28 of the Lease and settled Ohio law. That is precisely what the City seeks to do.

At pages 27-34 of the Partial Opinion (Exhibit C hereto), the Bankruptcy Court completely and carefully addressed whether the Lease could be extended. The Bankruptcy Court addressed every argument the City advanced. Rather than repeating what the Bankruptcy Court held, Debtor respectfully refers this Court to pages 27-34 of the Partial Opinion. Moreover, the Bankruptcy Court addressed this issue again at pages 5-6 of the February 10, 2009 Opinion, attached hereto as Exhibit E:

First is this Court's finding that there is no language in the Lease requiring the lessee to be current with its obligations under the contract at the time that it gave notice of its exercise of the option to extend the Lease for the one ten-year option period. The City has argued that this Court should fill that contractual void. Applying the parties' choice of law, Ohio law, there is long-standing authority that, when sophisticated parties have included an integration clause in their contract, courts should not supply terms that the parties did not. *Bd. of Trustees of Union Tp.*

> *Planned Dev. Co. of Ohio*, 2000 WL 1818540 *7 (Ohio App. 12th Dist. Dec. 11, 2000); *Truetries Svc. Co. v. Hager*, 691 N.E.2d 1112, 1115 (Ohio Ct. App. 8th Dist. 1997); *Aultman Hosp. Ass'n v. Cmty. Mut. Ins. Co.*, 46 Ohio St. 3d 51, 53-4 (Ohio 1989). The single, unreported decision from an intermediate Ohio appellate court on which the City relies, *Horn v. LaPille*, 984 WL 6969 (Ohio App. 1 Dist. 1984), has been fully addressed in the Oral Ruling of January 31, 2008. On the facts of this case, the likelihood of reversal on this question is not substantial.

The City bases its argument in the Stay Motion upon an unreported decision from an Ohio court of appeals, *Horn v. LaPille*, 1984 WL 6969 (1st Dist. 1984). In that case, Horn leased premises to LaPille. An addendum to the lease gave the tenant a right of first refusal on an extension. The court notes, on two occasions, a critical fact which makes *Horn* inapplicable:

> Horn testified, without objection, that the intention was that this right of first refusal was contingent upon LaPille's compliance with the other terms and conditions of the lease.

1984 WL 6969 at *1. Later, the court noted:

> Horn's testimony was sufficient for the court to find that the intention of added paragraph 24 (the right of first refusal) was that it was subject to compliance with the other terms and provisions of the lease and therefore exercisable by LaPille only if she was not in default. (This state of the record makes it unnecessary in this appeal to determine whether there is an implied condition of compliance with lease terms that attaches to rights and options over and beyond the possessory terms of the lease.)

1984 WL 6969 at *4.

This critical fact renders *Horn* meaningless in this case. Section 2 of the Lease between ATLP and the City contains no such condition. The *Horn* court went on to discuss issues of waiver and estoppel, based upon the unique facts of that case. The Bankruptcy Court has fully addressed these issues, at pages 31-32 of the Partial Opinion (Exhibit C hereto), and again, to avoid repetition the Court is respectfully referred thereto. Those are factual issues and the City

has not demonstrated the Bankruptcy Court's findings concerning the waiver and estoppel arguments were clearly erroneous.

Finally, the Bankruptcy Court held that ATLP can extend the Lease based on section 365 of the Bankruptcy Code.

> As previously discussed, the implication of a condition that the tenant not be in substantial default of lease payment terms is premised upon the unfairness of allowing the tenant to extend for a full renewal period the uncertainty of future rental payments. Section 365 of the Code, however, specifically addresses that unfairness: it allows a debtor to assume the contract if, and only if, the debtor can *both* cure the past monetary defaults and convince the Court that it is likely the debtor will be able to perform all of its future obligations (monetary or otherwise) under the agreement. Nothing in state contract law or property law corresponds to the assumption rights created under Section 365.  In light of that congressional resolution of the fairness issue, the "fundamental fairness" issue is for all intents and purposes mooted.  *See also,* 4-68 Collier Bankruptcy Practice Guide ¶ 68.05[3] (Lawrence P. King et al. eds., 15th Ed. Rev. 2007) (stating "a debtor who has defaulted pre-petition on an unexpired lease may exercise its option to renew that lease without first assuming the lease or curing any pre-petition defaults," conditioned on the "eventual assumption of the lease . . . and cure of all defaults in compliance with the requirements of section 365(b)(1).") (citing *In re Revco D.S., Inc.*, 111 B.R. 626 (Bankr. N.D. Ohio 1989); *In re Cook United, Inc.*, 53 B.R. 342 (Bankr. N.D. Ohio 1985); *In re Circle K Corp.*, 190 B.R. 370 (B.A.P. 9th Cir. 1996); *In re Webster Clothes, Inc.*, 36 B.R. 260 (Bankr. D. Md. 1984)).

Partial Opinion (Exhibit C hereto) at 33-34 (footnotes omitted).

The City has no chance of success on appeal of this issue.

### 5.      Termination of Lease

The City claims that it terminated the Lease prior to the petition date, and therefore ATLP could not assume it.  This is a quintessential question of fact, which was the subject of the evidentiary hearing on January 14-15, 2008.  The City's own documents and testimony rebuts its argument.  A bit of further background is appropriate.  ATLP executed the Lease in 1997.  With

the complete knowledge and obvious consent of the City, ATLP did not pay rent from 1997 forward.  In December 2004, there was a change in general partner of ATLP.  The change in general partner required the consent of the City, which was provided in a letter dated July 2004. *See* Lease Assumption Exhibit 42.  The City entered into two Lease Amendments by which the City pre-paid ATLP over $550,000 for steam, in 1998 and 2005, and never raised the non-payment of rent.  *See* Exhibit F hereto.

At no time from 1997 until June 2007 did the City demand payment from ATLP.  There was considerable testimony below on this point.  In 2006 and 2007, the parties were working on a resolution of ATLP's debt structure.  Then, with no prior notice, on June 13, 2007, the City delivered a notice which stated, in relevant part, that:

> Pursuant to Section 13 of the Operating Lease Agreement entered into between the City of Akron and Akron Thermal, LP dated August 15, 1997, the City of Akron hereby terminates said Agreement **effective Tuesday, June 19, 2007 at 9:00 a.m.** . . . (emphasis added)

ATLP filed its Chapter 11 petition on June 18, 2007, <u>before</u> the date the termination date noted by the City.  Thus, it had the right to seek to assume the Lease, if it otherwise met the requirements of Section 365 (including cure of all past monetary defaults).  The Bankruptcy Court addressed the full factual record and on January 31, 2008 held that the City had not terminated the Lease.  As a result, it was property of the estate (11 U.S.C. § 541) and it could be assumed in accordance with 11 U.S.C. § 365.  As a result of the assumption, the City will be paid in full all back rent plus interest.  In fact, the total cure is in excess of $2.5 million, which would be paid to the City within ten days after the Effective Date.

Section 365(c)(3) of the Bankruptcy Code provides that a trustee or debtor may not assume a lease if "such lease is of nonresidential real property and has been *terminated under applicable nonbankruptcy law prior to the order for relief . . . .*"  11 U.S.C. § 365(c)(3) (italics

added). In cases dealing with the issue of whether a commercial real property lease was terminated or remained valid as of the date of filing the bankruptcy petition, courts within the Sixth and Seventh Circuits have held that:

> The termination process . . . must be completed and not subject to reversal, either pursuant to the terms of the contract or under state law, including anti-forfeiture statutes or waiver doctrines.

*In re Pyramid Operating Authority, Inc. v. City of Memphis*, 144 B.R. 795, 808 (Bankr. W.D. Tenn. 1992) (citing *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1212 (7th Cir. 1984), *cert. denied*, 105 Sup.Ct. 386; *In re Memphis-Friday's Assocs.*, 88 B.R. 830, 840 (W.D. Tenn. 1988)).

In determining whether the Lease in this case became property of the estate under Section 541 upon filing the petition, and whether the Lease was valid, enforceable and "unexpired," the Court must look to the law of Ohio – applicable non-bankruptcy law. *See*, *In re 1345 Main Partners, Ltd.*, 215 B.R. 536, 541 (Bankr. S.D. Ohio 1997). The law of Ohio concerning the validity and enforceability of a commercial lease in default has been stated as follows:

> Courts in Ohio have determined that lessors can opt to terminate a nonresidential lease under a forfeiture clause in the lease in limited circumstances and only upon satisfaction of a four part test: (i) the tenant unlawfully holds over or is in breach of the lease; (ii) the landlord gives notice of the termination, if required, or notice of and an opportunity to cure the breach; (iii) a provision in the lease provides for self-help repossession; and (iv) the repossession is accomplished without a breach of the peace.

*In re 1345 Main Partners, Ltd.*, 215 B.R. at 541 (underline added) (citing *Quigg v. Mullins*, 1991 WL 59886 (Ohio Ct. App. 1991), citing *Craig Wrecking Co. v. S.G. Loewendick & Sons, Inc.*, 38 Ohio App.3d 79, 526 N.E.2d 321 (1987) and *Northfield Park Assocs. v. Northeast Ohio Harness*, 36 Ohio App.3d 14, 521 N.E.2d 466 (1987)).

Based upon the only written evidence of the City's desire to terminate the Lease, contained in the Notice to Leave, the Lease was not terminated prior to the Petition Date, as it

was not set to terminate until June 19, 2007.  There is no provision within the Lease that governs exactly when a termination would occur.  The City's contention that it had terminated the Lease at some prior point is contradicted by the Notice to Leave.  Moreover, the City never gave the Debtor any previous notices of defaults under the Lease that the City intended to enforce.  There is no evidence that the Lease was set to terminate on any day other than June 19, 2007, after the Petition Date.

Under Ohio law, specifically Ohio Revised Code § 1923.04, a landlord must "give a commercial tenant at least three days' notice to vacate the premises" before the landlord can bring a summary proceeding for forcible entry and detainer.  *Maggiore v. Kovach*, 101 Ohio St.3d 184, 186, 803 N.E.2d 790, 2004-Ohio-722 {¶ 8} (2004).  The three-day period is computed under Ohio Revised Code § 1.14 and Ohio Rule of Civil Procedure 6(A), together, under which the first day and weekends are not counted.  O.R.C. § 1.14; Civ. R. 6(A); *see also*, *Midtown Apartments v. Davis*, 1985 WL 6004 (Ohio App. 10th Dist.).  Thus, based on the June 13, 2007 service date of the Notice to Leave, the City could not have filed a summary proceeding to regain possession of the System – the leased premises – until June 19, 2007, after the Petition Date.

Under the four-part test for termination of a nonresidential lease under a forfeiture clause, the second and third elements (a provision for self-help repossession and accomplishing repossession) has never occurred, such that ATLP's Lease with the City had not been terminated.  On the continuum of actions necessary for the City to terminate the Lease and retake possession of the System – the leased premises – the City did not make it past the very first step of deciding to terminate the Lease due to default, and the alleged date of termination did not occur prior to the Petition Date.

Therefore, considering that the date for termination was not set to occur until after the Petition Date and because the City did not satisfy the four-part test relied upon in *In re 1345 Main Partners, Ltd.* to determine when an Ohio lease is terminated, the Lease was not terminated prior to the Petition Date.  215 B.R. 536.

Upon filing this Chapter 11 case, the Lease had not been terminated, it became property of the estate and the automatic stay prevented the City from proceeding to take further action to attempt to terminate the Lease.  11 U.S.C. §§ 541, 362(a)(3); *see e.g.*, *In re Memphis-Friday's Assocs.*, 88 B.R. 830, 834 (Bankr. W.D. Tenn. 1988).  Then, under section 365, ATLP could seek to assume the Lease, by curing the monetary default.

Even if the termination set forth in the Notice to Leave became effective subsequent to the Petition Date, the City has not completed the four parts under the Ohio law on termination under forfeiture clauses and within bankruptcy "termination must be complete and not subject to reversal, either under the terms of the contract or under state law." *Moody v. Amoco Oil Company*, 734 F.2d 1200, 1212 (7th Cir. 1984) *Id.* (citing L. King, 2 Collier on Bankruptcy ¶ 365.03 (15th ed. 1979); *In re Fontainebleau Hotel Corp.*, 515 F.2d 913 (5th Cir. 1975).

Even if the City had terminated the Lease under Ohio law prior to the Petition Date, "the Debtor is still not precluded from assuming the lease under Section 365 unless such right was irretrievably lost under state law before it filed its bankruptcy petition." *See*, *In re O.H. Holding Co.*, 132 B.R. 568, 571 (Bankr. E.D. Mich. 1991).

Ohio law provides that the Debtor's interest can and should be equitably revived:

> Clauses in written leases which give lessors the right to declare forfeiture of a lease for nonpayment of rent are valid.  However, unless a lessee's conduct is willful or malicious, or if compensation for the breach cannot be made due to the lessor, a court exercising its equity powers will grant the lessee relief from forfeiture.  The forfeiture clause for nonpayment of rent is not

> strictly construed, rather, it is viewed as merely security for the payment of rent. The courts will balance the equities of the case and relieve the forfeiture where the equities favor the lessee.

*In re 1345 Main Partners, Ltd.*, 215 B.R. at 541 (italics in original). Moreover,

> Equity requires a balancing of all the circumstances of a controversy, and a trial court, within its discretion, is entitled to weigh all equitable considerations in determining whether a forfeiture is to be declared.

*Southern Hotel Co. v. Miscott, Inc.*, 44 *Ohio* App.2d 217, 337 N.E.2d 660, 661 (10th Dist. 1975) (syllabus).

"Numerous Ohio cases involving lease agreements stand for the proposition that equity abhors a forfeiture and that a forfeiture will not be declared where the equities of the parties can be adjusted." 215 B.R. at 541-42 (citing *In re Fry Bros. Co.*, 52 B.R. 169 (Bankr. S.D. Ohio 1985) (Perlman, J.) citing *Peppe v. Knoepp*, 103 Ohio App. 223, 140 N.E.2d 26 (1956)). A breach of the terms of the Lease concerning the payment of rent due thereunder does not require forfeiture. *See*, *Peppe v. Knoepp*, 103 Ohio App. at 224.

"Forfeiture of a lease for nonpayment of rent is clearly subject to the power of a court in the exercise of its equitable jurisdiction to grant relief therefrom in a proper case." *Southern Hotel Co. v. Miscott, Inc.*, 44 Ohio App.2d at 221 (citing 31 A.L.R.2d 315, Relief Against Forfeiture of Lease for Nonpayment of Rent, pages 327 through 330, sections 3 and 4). When equitable defenses to a forfeiture are raised, "it would be error for the court to impose a forfeiture without first weighing the equitable considerations." *Greenbriar Estates v. Eberle*, 130 Ohio Misc.2d 11, 15, 2005-Ohio-1139 {¶ 12}, 824 N.E.2d 172 (Clermont Cty. 2005) (citing *Bella Vista Apts. v. Herzner,* 125 Ohio Misc. 2d 1, 2003-Ohio-4872 {¶ 7}, 796 N. E.2d 593.

In Ohio, "[a] tenant may be relieved from the harsh consequences of a forfeiture where monetary damages will adequately compensate the landlord."  *Greenbriar Estates*, 2005-Ohio-1139 {¶ 13} (citing *Gorsuch Homes Inc. v. Wooten*, 73 Ohio App.3d 426, 597 N.E.2d 479 (1992)).  While lease clauses giving a lessor the right to declare a forfeiture (termination) are valid:

> unless a lessee's conduct is willful or malicious, or if compensation for the breach cannot be made due to the lessor, a court exercising its equity powers will grant the lessee relief from forfeiture. . . .  The courts will balance the equities of the case . . . .

*Zanetos v. Sparks* (1984), 13 Ohio App.3d 242, 244; *see also*, *Elkton Assocs. v. Shelco Inc.*, 107 B.R. 483, 486 (Bankr. D. Del. 1989) (applying Maryland law to allow a debtor to assume, holding that where a lease contains a termination for failure to pay rent provision, "it is well settled that a court of equity will relieve the lessee and set aside a forfeiture incurred by his breach of the condition, whether the lessor has or has not entered and dispossessed the tenant.").

If a commercial lease is subject to reinstatement, then there can be no termination under Sections 365(c)(3) or 541(b)(2).  *Elkton Assocs. v. Shelco Inc.*, 107 B.R. at 487.  "Traditionally, lease forfeiture clauses are liberally construed in favor of the bankrupt lessee, especially in reorganization cases."  *Id.* (citing *Finn v. Meighan*, 325 U.S. 300, 65 S.Ct. 1147, 89 L.Ed. 1624 (1945); *In re Fleetwood Motel Corp.*, 335 F.2d 857 (3d Cir. 1964).

The most on-point case applying Ohio law to the issue of a commercial lease termination within a bankruptcy is *In re 1345 Main Partners, Ltd.*, 215 B.R. 536 (Bankr. S.D. Ohio 1997).  Again, in the continuum of termination and eviction, the case now before this Court presents a circumstance that was at the very beginning, with nothing but the delivery of the Notice to Leave occurring before the Petition Date.  In contrast, in the *In re 1345 Main Partners Limited* case, prior to the petition date the landlord had declared a forfeiture under the Lease and had bolted the

doors to the premises.  *Id.*  That case involved a similar lease provision stating that as to any payment remaining unpaid for a certain period of time, the landlord could terminate the lease without notice.  *Id.* at 539.  The court found that the terms of the lease gave the lessor a right to "claim possession of the leasehold as though the lease had not been made in the first instance."  *Id.*  After the premises had been bolted, but prior to filing bankruptcy, the debtor filed a complaint and motion for temporary restraining order in state court.  *Id.*  The state court denied the motion and debtor then filed bankruptcy.  *Id.*  The debtor, dispossessed of the premises, then filed a motion for re-entry in the bankruptcy case in order to assume the lease.  *Id.* at 539-40.

Similar to the City's position, the lessor in *In re 1345 Main Partners Limited* argued that the lease effectively terminated pre-petition under the terms of the lease.  *Id.* at 540.  In analyzing whether the lease was terminated pre-petition, the court distinguished bankruptcy cases applying the laws of other states, finding the court "must first determine whether the lease was still valid and enforceable under Ohio law at the commencement of the bankruptcy case."  *Id.* at 541 (distinguishing *Matter of Mimi's of Atlanta, Inc.*, 5 B.R. 623, 628 (Bankr. N.D. Ga. 1980); *Bell v. Alden Owners, Inc.*, 199 B.R. 451, 458 (S.D.N.Y. 1996)).  It was in this context that the court stated:

> Courts in Ohio have determined that lessors can opt to terminate a nonresidential lease under a forfeiture clause in the lease in limited circumstances and only upon satisfaction of a four part test . . . .

*Id.* at 541 (italics added).

The lease involved in *In re 1345 Main Partners Limited* did not require notice of termination.  *Id.* at 542.  The Court noted that both lessor and lessee had invested substantial money, time and energy in the property and that debtor was "caught totally off guard" by lessor's actions in pursuing forfeiture (termination) without any notice or opportunity to cure.  *Id.* at 542.  And, most importantly, the court found that because it would be impossible for the debtor "to

reorganize its business under the protection of Chapter 11 unless it has possession and use of the premises covered by the lease," the equities weighed in favor of the debtor.  *Id.* at 542 (citing *In the Matter of Triangle Labs., Inc.*, 663 F.2d 463 (3d Cir. 1981); *Southern Hotel Co. v. Miscott, Inc.*, 44 Ohio App.2d 217, 337 N.E.2d 660.  As a result, the Court granted the debtor's motion for return of the premises, reinstating the lease.

Similarly, in the *Southern Hotel Co.* case involving a commercial lease, the court stated that "[f]orfeiture of a lease for nonpayment of rent is clearly subject to the power of a court in the exercise of its equitable jurisdiction to grant relief therefrom in a proper case."  *Southern Hotel Co.*, 44 Ohio App.2d at 221 (citing annotation 31 A.L.R.2d 315, Relief Against Forfeiture of Lease for Nonpayment of Rent, p. 327-330, §§ 3-4).  Moreover, when there is a prior course of dealing, a court may decide that there should be a requirement to "give advance notice of an intention to require strict compliance with the terms of the lease . . . ."  *Id.* at 222 (citing *Bates & Springer, Inc. v. Nay*, 187 N.E.2d 415, 91 Ohio Law Abs. 425 (1963) and *Lauch v. Monning*, 15 Ohio App.2d 112, 239 N.E.2d 675 (1968)).

As in this case, where the breaches under the Lease for non-payment of rent and franchise fees are breaches of "rent" due under the Lease (Sections 3.1 and 3.2(a)) that are wholly compensable in money, payment of such amounts is a sufficient basis to avoid forfeiture of the Lease.  *See*, *Tabor v. Bellman*, 13 Ohio App 382 (1919); *Whitmore v. Meenach*, 33 Ohio Law Abs. 95, 99.  The only Events of Default which could have been the basis of termination of the Lease prior to the Petition Date – the rent and franchise fees – can readily be cured.

In balancing the equities regarding the Lease, one of the most important considerations is whether "it would be impossible for Debtor to attempt to reorganize its business under the protection of Chapter 11 unless it has possession and use of the premises covered by the lease."

*In re 1345 Main Partners, Ltd.*, 215 B.R. at 542 (citing *In the Matter of Triangle Laboratories, Inc.*, 663 F.2d 463 (3d Cir. 1981) (termination provisions in a lease will be given effect unless doing so will contravene the purposes of the Bankruptcy Act including considerations of whether forfeiture will make it impossible for a debtor to reorganize, cause complete loss to creditors, or deprive debtor of its primary asset)).

Where the prior history between the parties indicates that there has been "a waiver of strict compliance with the precise terms of the lease" and no forfeiture had been declared for defaults in the past, there is "a requirement to give advance notice of an intention to require strict compliance with the terms of the lease . . . ."  *Southern Hotel Co. v. Miscott, Inc.*, 44 Ohio App.2d at 221-22 (citing *Bates & Springer, Inc. v. Nay*, 91 Ohio Law Abs. 425, 187 N.E.2d 415 (Ohio App. 1963); *Lauch v. Monning*, 15 Ohio App.2d 112, 239 N.E.2d 675 (1968).

In a similar Ohio case in which the lessees failed to timely pay rent and failed to properly renew the lease for fifteen (15) years, but in which the lessor never sought to strictly enforce the lease, the court found that the lessor's attempt to terminate the lease for a late payment without warning was barred by waiver and estoppel:

> We hold that under such circumstances, the failure of the lessors to make timely objection to these admitted breaches by the appellee amounted to a waiver, and that the appellants are now estopped from setting up any such breach as grounds for termination of this lease.

*Finkbeiner v. Lutz* (1st Dist. 1975), 44 Ohio App.2d 223, 226-27, 337 N.E.2d 655.  While the conduct did not prevent the lessor from strictly enforcing the lease in the future, it did result in that Court holding:

> where, as here, a course of conduct is engaged in between the parties to a lease, which conduct is contrary to the specific provisions within the lease, such conduct will speak for itself, and the parties will be estopped from denying that conduct and its immediate and logical consequences.

*Id.* at 228.

This holding is quite applicable in this Chapter 11 case where the City, prior to delivering the Notice to Leave, never enforced the terms of the Lease.  *See also*, *Mark-It Place Foods, Inc. v. New Plan Excel Realty Trust* (4th Dist. 2004), 156 Ohio App.3d 65, 92-93, 2004-Ohio-411 {¶ 57}, 804 N.E.2d 979 (stating "'waiver by estoppel' exists when the acts and conduct of a party are inconsistent with an intent to claim a right, and have been such as to mislead the other party to his prejudice and thereby estop the party having the right from insisting upon it.").

In 1998 and 2005, the City entered into the Amendatory Agreements to the Lease, whereby, with full knowledge of Debtor's failures to pay the Lease payments and franchise fees since 1997, the City pre-paid over $550,000 to ATLP for steam.  *See* Exhibit F hereto.  This evidences that the City did not consider the failures to pay non-payment of rent to be material or a reason to terminate the Lease.

Based on the evidentiary record, the Bankruptcy Court found that the Lease had not terminated:

> [A]ccordingly, the Court finds the City's notice to be the best evidence of when the City intended to terminate the lease, which was Tuesday, June 19, 2007, at 9:00 a.m.  The finding that the City chose to terminate the lease not at the conclusion of the June 12th meeting but at a future date is also supported by the uncontroverted testimony that Akron Thermal could not simply cease operation of the energy system due to the nature of the operations and regulations of the PUCO.  Had the City actually terminated the lease on June 12th, it would have been temporarily left without an operator for the energy system, which provides steam and heat to, among others, three area hospitals.
>
> It seems implausible that the City would have voluntarily put itself into such position.

Jan. 31, 2008 Oral Opinion at 29-30.

The City cannot demonstrate that it is likely to prevail on this issue on appeal.

6.      **Release of Third Parties**

In paragraph 82 of the Stay Motion, the City makes the bald assertion that it has a cause of action against Thermal Ventures II, L.P. ("TVII") for "guarantee of ATLP liabilities to the City."  The City has never produced a document signed by TVII to support this claim, as would be required under the Statute of Frauds.  *See* O.R.C. § 1335.05.  There being no support for this argument, it should be summarily rejected.  The Bankruptcy Court so noted at page 8 of the February 10, 2009 Opinion (Exhibit E hereto):

> The City identifies as its fourth issue the loss of a purported guaranty by TVII of the Reorganized Debtor's performance under the Lease.  The City completely fails to develop this issue.  That being the case, this Court is not in a position to further address the matter in this procedural context.  *See Griepentrog*, 945 F.2d at 153-54.

Because the City has failed to establish that it is likely to prevail on merits, the Court is warranted, indeed is compelled, to deny the City's request for a stay pending appeal.  *See*, *Jarboe v. Yukon Nat'l Bank (In re Porter)*, 54 B.R. 81, 82 (Bankr. N.D. Okla. 1985) (holding that appellant was not entitled to a stay pending appeal, notwithstanding the other three elements, because appellant did not offer any argument or cite any controlling authority in support of its position that it would be successful on appeal); *see also*, *In re Crescenzi*, 58 B.R. 141, 142-44 (Bankr. S.D.N.Y. 1986) (stating it is appropriate to deny a stay where the appellant has not demonstrated a likelihood of success on the merits of the appeal).

B.      **The City has not Established That It will Suffer Irreparable Harm**

In order to justify a stay of the Confirmation Order, the City must also show "irreparable harm [to it] that decidedly outweighs the harm that will be inflicted on others if a stay is granted."  *Baker v. Adams County/Ohio Valley Sch. Bd.*, 310 F.3d 927, 928 (6th Cir. 2002); *Webb Mtn, LLC*, 2007 WL 4126016, *4.  To do so, the City must prove that "the harm alleged

[is] both certain and immediate, rather than speculative or theoretical" and that in turn, requires evidence "that the harm has occurred in the past and is likely to occur again." *Griepentrog*, 945 F.2d at 154 (quoting *Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 953 (1974); *Webb Mtn, LLC*, 2007 WL 4126016, *4. The failure to show irreparable injury "is, in itself, sufficient grounds on which to deny a preliminary injunction." *Harris v. United States*, 745 F.2d 535, 536 (8th Cir. 1984) (per curiam); *Abbo*, 191 B.R. 683.

In this Circuit, the standard for determining the degree of injury necessary to rise to the level of "irreparable" for purposes of a stay pending appeal, is as follows:

> In evaluating the harm that will occur depending upon whether or not the stay is granted, we generally look to three factors: (1) the substantiality of the injury alleged; (2) the likelihood of its occurrence; and (3) the adequacy of the proof provided. . . . In evaluating the degree of injury, it is important to remember that.
>
> > [t]he key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm. . . .
>
> In addition, the harm alleged must be both certain and immediate, rather than speculative or theoretical. . . . In order to substantiate a claim that irreparable injury is likely to occur, a movant must provide some evidence that the harm has occurred in the past and is likely to occur again. . . .

*Griepentrog*, 945 F.2d at 154 (citing *Sampson*, 415 U.S. at 90) (quoting *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)) (other citations omitted). *See also, F.G. Metals*, 390 B.R. at 477.

> The irreparable harm must be "neither remote nor speculative, but actual and imminent." (Citations omitted). "Mere injuries,

> however substantial, in terms of money, time, and energy necessarily expended in the absence of a stay, are not enough."

390 B.R. at 477, *quoting Lickman*, 301 B.R. at 748.

"A majority of the cases which have considered the issue have found that the risk that an appeal may become moot does not, standing alone, constitute irreparable injury." *In re Convenience USA, Inc.*, 290 B.R. 558, 563 (Bankr. M.D.N.C. 2003) (citing numerous cases so holding). *See also F.G. Metals*, 390 B.R. at 477; *In re Sunflower Racing, Inc.*, 223 B.R. 222, 225 (D. Kan. 1998); *In re Moreau*, 135 B.R. 209, 215 (N.D.N.Y. 1992); *Public Service Co. of New Hampshire*, 116 B.R. at 350 (possible mootness "not enough to show sufficient injury to appellant to warrant the stay"). *Dakota Rail*, 111 B.R. at 821 (the "mootness of his appeal is not sufficient, by itself, to establish that Ross will be injured by denying the stay,"); *In re Charter Co.*, 72 B.R. 70, 72 (Bankr. M.D. Fla. 1987) (same); *In re Great Barrington Fair and Amusement, Inc.*, 53 B.R. 237, 240 (Bankr. D. Mass. 1985) (same)).  The only decision which ATLP found within this Circuit agreed that the fact that an appeal may become moot if a stay is not granted does not, in itself, demonstrate or establish "irreparable" harm.  *Baldwin United*, 45 B.R. at 386.  *Contra, Adelphia*, 361 B.R. at 347-49.

The City has completely failed to carry its burden of proof on this factor.  The City has provided not one shred of evidence that it will suffer irreparable harm that "has occurred in the past and is likely to occur again."  *Webb Mtn, LLC*, 2007 WL 4126016, *4.  The City has completely failed to show any harm, much less irreparable harm.  On this basis alone, the Stay Motion should be denied.

The City's claimed "damages" as a result of the alleged federal Clean Air Act violations associated with the operation of Boiler 32 are particularly ironic in light of the City's consistent refusal to work with ATLP to explore options to resolve this matter with USEPA and active

opposition to innovative technology, e.g. coal gasification, which would have provided substantial environmental benefits.  Instead of cooperating with ATLP to resolve the Boiler 32 NOV with USEPA, which would have eliminated the potential "damages" the City now claims, the City preferred to disingenuously argue that the unresolved NOV was a breach of the Operating Lease.

Equally disingenuous is the City's argument that a stay is necessary to prevent further "damages" as a result of the unresolved NOV.  To the contrary, a stay will prevent ATLP from moving forward on negotiating a resolution of the NOV with USEPA, exposing both the City and ATLP to potential enforcement litigation.

Consummation of the Plan means ATLP will make the City whole on the Lease through payment of over $2.5 million, the cure amount ordered by the Bankruptcy Court.  Thus, it is difficult to see what actual, concrete harm, as opposed to speculative or theoretical harm, will befall the City if the Plan is consummated.  Conversely, the delay caused by a stay pending appeal may derail the City's ability to recover any monies owed it under the Lease, not to mention the entire reorganization, the other creditors' ability to recover any amount on their claims, and could subject ATLP to the accrual of daily penalty amounts assessed by the United States Environmental Protection Agency ("USEPA").  *See* Section (C) below.

At page 9 of its February 10, 2009 Opinion (Exhibit E hereto), the Bankruptcy Court noted:

> Despite the explicit direction that the City could have taken from this controlling Six (sic) Circuit authority, the City presented no evidence at the Stay Hearing.  Rather, in a case where the Court heard evidence on 16 different days, the City asserted that evidence of irreparable harm to it could be found in the evidentiary record of the case.  In making this assertion, the City did not bother to direct this Court's attention to any particular evidence that had

been admitted previously.  Thus, the City not only failed to carry its burden on this element, it made no effort to do so.

**C.**     **ATLP, Along With Its Creditors, Customers and Others Will Suffer Substantial and Irreparable Harm if a Stay is Granted**

The third factor involves an analysis of "whether issuance of the stay will substantially injure the other interested parties." *Griepentrog*, 945 F.2d at 153.  The City, as the party seeking the stay, must establish that the other parties, such as ATLP, its creditors and customers, "will not suffer substantial harm if the stay is granted." *Adelphia*, 361 B.R. at 349 (citing *Mohammed v. Reno*, 309 F.3d 95, 100 (2d Cir. 2002).  The City has offered no evidence, and, in fact, a stay will cause irreparable harm to many parties.

**1.**     **Issuance of a Stay Jeopardizes the Plan Itself.**

A "reasonable estimate for obtaining a final appellate ruling . . . [is] six months to two years." *Baldwin United Corp.*, 45 B.R. at 387.  ATLP submits that resolution would take far beyond two years.  Such a delay jeopardizes the Plan itself and results in enormous and irreparable harm to ATLP, the estate, the other creditors and a number of innocent parties.

While difficult to quantify with certainty, there can be no doubt that issuance of a stay jeopardizes the Plan and puts consummation of the Plan in doubt.  More specifically, to fund the Plan, TVII will provide $3 million of new equity and $250,000 of debt.  Under the Plan, issuance of a stay could cause the Plan itself to collapse.  Sections 13.2 and 13.4 of the Plan provide, in relevant part, as follows:

> **13.2.**   **Conditions to the Effective Date.**   The following are conditions precedent to the Effective Date of the Plan, each of which may be satisfied or waived in accordance with section 13.3 below:
>
> > (a)     The Confirmation Order shall have become a Final Order and no request for revocation of the Confirmation Order under section

1144 of the Code shall have been made, or if made, shall remain pending.

(b)     Any and all approvals and consents appropriate under the public utility laws of Ohio or required by the PUCO shall have been obtained.

\*     \*     \*

**13.4.   Effect of Failure of Conditions.**   In the event that each of the conditions specified herein have not occurred or been duly waived on or before 60 days after the Confirmation Date for such Plan, or by such later date as is proposed by the Debtor and approved by the Court, after notice and a hearing upon the motion of the Debtor, or the Reorganized Debtor, the Confirmation Order for such Plan may be vacated by the Bankruptcy Court.

*See* Exhibit G hereto.  The term "Final Order" is defined at section 1.51 of the Plan as an order or judgment which has not been stayed, reversed or amended.

While TVII has been supportive, the economic realities of the business may be substantially different if a stay is granted, and there is no assurance that TVII will provide the funding for an open-ended period of time.  *See* Leidel Affidavit (Exhibit B hereto) at ¶¶ 3-5.  Thus, issuance of a stay jeopardizes the Plan.  Courts have repeatedly held that the possible failure of a plan of reorganization as a consequence of a stay is a significant injury.  *See Public Service*, 116 B.R. at 350; *Baldwin United*, 45 B.R. at 387.  In that event one creditor – the City – would impose its will upon all others who have voted for or agreed to the Plan and would result in no payment to all the others who favor the Plan.  Such a result is patently unfair and is precisely the type of irreparable harm that a stay can cause.  *See Convenience*, 290 B.R. at 564-66.

**2.        Issuance of a Stay Hinders ATLP's Ability to Operate its Business.**

Issuance of a stay continues the uncertainties that arise out of a pending chapter 11 case. ATLP's ability to pursue potential new customers or new strategies is severely compromised.

ATLP's decisions with respect to capital projects, most of which are tied to maintenance and operations, are likewise adversely impacted.  ATLP cannot commit to long term expensive projects (which could further improve reliability and service) so long as it's status as operator is held in limbo.  Bees Affidavit at ¶ 9.  While difficult to quantify, there is nevertheless real harm and prejudice created by this uncertainty.

### 3. Issuance of a Stay Hinders ATLP's Ability to Negotiate Terms with its Customers.

During the course of the chapter 11 proceedings, ATLP has attempted to negotiate terms with large customers who do not already have long term agreements or whose agreements expire shortly.  Two specific situations are described in the Bees Affidavit.  The University of Akron's current service contract expires April 30, 2009.  ATLP has notified the University that it wishes to extend the service agreement.  Bees Affidavit at ¶ 3.  The current contract with Akron General Medical Center ("AGMC") expires March 31, 2009.  ATLP has notified AGMC that it wishes to extend the contract, and AGMC has the option to extend for two years.  Bees Affidavit at ¶ 4.

Another situation was described at the confirmation hearing.  ATLP has attempted to pursue discussions of a long term arrangement with Summa Health System ("Summa"), including a variety of operating issues.  Summa has embarked upon a new building program which requires installation of a new section of the condensate return line.  Summa and ATLP have attempted to resolve these matters, but they have not been able to complete an agreement because of the uncertainty arising out of the ongoing bankruptcy proceedings.  *See* Bees Affidavit at ¶¶ 5-6.

These three customers account for 62.6% of ATLP's sales and 53.7% of its revenues.  *See* Bees Affidavit at ¶ 6.  Since the bankruptcy filing, these (and other) customers have expressed their hesitance to pursue discussions about their service agreements until it is clear that

ATLP will be the operator going forward.  *See* Bees Affidavit at ¶ 6.  Issuance of a stay perpetuates this uncertainty and potentially deprives the ATLP of substantial sources of income. Once the Plan goes effective, it will be clear to ATLP's customers that ATLP will be the operator for years to come and the parties can enter into appropriate agreements.

### 4.    Issuance of Stay Undermines ATLP's Working Capital.

During the course of the chapter 11 proceedings, ATLP has been forced to pre-pay for most of its goods and services.  For example, ATLP pre-pays for electricity and water and sewer services, approximately $200,000 every month.  *See* Bees Affidavit at ¶ 7.  In addition, ATLP has provided deposits of $50,000 each to Ohio Edison and the City of Akron for electricity and water and sewer.  *See* Stipulated Order Determining Satisfactory Adequate Assurance of Payment to the City of Akron filed July 3, 2007 [Docket No. 67] and Stipulated Order Determining Satisfactory Assurance of Payment to Ohio Edison Company filed July 3, 2007 [Docket No. 65].  ATLP also pre-pays for almost all other goods and services.

Upon the Effective Date, ATLP would be able to resume normal trade terms with its suppliers.  That will generate approximately $700,000 of working capital.  *See* Bees Affidavit at ¶ 7.  *See also* Plan (Exhibit G hereto) at § 7.9 (terminating the orders which provide pre-payments for utilities).  This added working capital is vital, particularly in the winter months. During these months, ATLP must front the money to purchase large amounts of fuel but does not begin to collect from its customers for the higher volume of steam and hot water produced from that fuel until sometime later.

Issuance of a stay precludes ATLP from having the use of this working capital at a critical time in the life cycle of its operations.

5.      **Issuance of a Stay Delays Collection of Higher Rates from Canal Place and Others.**

ATLP has negotiated a long term resolution with Canal Place, Ltd.  Until the Effective Date, Canal Place pays the contract rate plus $240,000 per year.  After the Effective Date, Canal Place pays the contract rate plus $375,000 per year, an increase of $135,000 per year.  *See* Motion of Debtor and Debtor-in-Possession Pursuant to 11 U.S.C. § 363 and Bankruptcy Rule 9019, For an Order Approving a Contract Modification and Compromise Between the Debtor and Canal Place, Ltd., filed October 20, 2008 [Docket No. 541], approved by the Order Approving a Contract Modification and Compromise Between the Debtor and Canal Place, Ltd. entered December 1, 2008 [Docket No. 553].  Issuance of a stay means that ATLP will not be able to collect the higher rates from Canal Place.

Along the same lines, two contracts are rejected under the Plan: an agreement with The Landings at Canal Park and Akron Professional Baseball, Inc.  *See* Plan at section 8.2.  ATLP has estimated that it has historically lost around $100,000 per year on the contact with the Landings.  *See* Bees Affidavit at ¶ 10.  A stay precludes ATLP from charging the tariff rates to both the Landings and the Aeros, and thereby realizing the added revenues.

6.      **Issuance of a Stay Precludes ATLP's Access To Additional Funds.**

Under the Plan, TVII will contribute $3 million in equity and make a $250,000 line of credit available to the ATLP.  From these funds, the City of Akron will be paid over $2.5 million and the State of Ohio approximately $150,000.  The remaining $500,000 could be used for a variety of ATLP's needs, including ongoing repairs and maintenance at the facility.

Issuance of a stay precludes ATLP from having access to this $500,000.  As with the revenue from Canal Place, the Landings and the Akron Aero's and the access to working capital,

the inability to use the $500,000 places additional financial strain upon ATLP.  *See* Bees Affidavit at ¶¶ 8-9.

       **7.**        **<u>Issuance of a Stay Would Derail the Settlement with the USEPA.</u>**

Issuance of a stay has the potential to completely derail the agreed resolution of the penalty claims asserted by USEPA thereby making it impossible to consummate the Plan. USEPA filed a Proof of Claim, asserting an unliquidated penalty, which on its face exceeds $451 million for pre-petition matters.  *See* Claim No. 49.  In addition, the USEPA has asserted that it can assess a penalty of $32,500 per day from the Petition Date forward.  *See* Claim No. 49. Although case law and USEPA policy augur against a financial penalty that would force a company out of business, absent a resolution, either claim has the potential to make consummation of the Plan impossible.

Following extensive discussions, which required approval at the highest levels of the Department of Justice, Debtor, the USEPA and the Committee were able to reach an agreement on the USEPA's penalty claims (both pre <u>and</u> post-petition).  The agreement is memorialized in a Stipulation and Agreed Order Resolving Objection of USEPA entered October 9, 2008 (the "USEPA Agreed Order").  A copy is included as part of Exhibit G hereto.  Under the USEPA Agreed Order, the USEPA is granted an allowed pre-petition claim of $1.1 million to be included in Class 3.2.  USEPA Agreed Order at ¶¶1-3.  The USEPA is also granted an administrative claim of $25,000 for penalty claims arising from the Petition Date through the Effective Date. *See* Agreed Order at ¶5.

However, with respect to the administrative claim, the resolution is expressly conditioned upon the Effective Date occurring by a date certain.  Paragraph 5 of the USEPA Agreed Order states as follows:

> 5. The EPA shall be allowed an Administrative Claim in the amount of $25,000 for postpetition penalties from June 18, 2007 through the Effective Date ("EPA's Administrative Claim") which shall be satisfied within 180 days after the Effective Date. This stipulation as to the amount of postpetition penalties is contingent upon the Effective Date being no later than December 31, 2008. EPA shall assert no additional administrative claim.

Debtor has been in touch with the USEPA and the USEPA has indicated it will agree to move the deadline for the Effective Date to perhaps as long as March 31, 2009, so long as the $25,000 is paid within ninety (90) days after the Effective Date. Issuance of a stay would make it impossible to achieve an Effective Date by March 31, 2009. As a result, the resolution of the administrative claim could be voided, and the USEPA could assert an administrative claim of $32,500 per day from June 18, 2007 forward. If an appeal takes just one year, the USEPA's potential administrative claim would be over $31 million.[7]

### 8. Issuance of a Stay Undermines the Ability of ATLP to Resolve the Injunctive Claims of USEPA.

The USEPA Agreed Order resolves the USEPA's penalty claim, but does not resolve the USEPA's demand that ATLP install new air pollution control measures. Issuance of a stay leaves the negotiations between ATLP and USEPA in limbo. ATLP cannot address USEPA's demands for injunctive relief so long as ATLP 's status remains unresolved.

As established during the hearings in this matter, the air emissions from ATLP's facilities are well within the levels that USEPA and Ohio EPA consider to be protective of human health. ATLP strongly disputes the USEPA's claims that additional control measures are required on Boiler 32. ATLP is fully prepared to litigate this issue. However, in an effort to reach a mutually acceptable compromise on this matter, and avoid protracted and expensive litigation,

---

[7] The Petition Date through February 18, 2009 is 20 months. Assuming an additional 12 months for an appeal, at $32,500 per day, the total is $31,633,333.

ATLP has proposed the installation of additional control measures that would reduce emissions of sulfur dioxide ("$SO_2$") by over 90% and emissions of nitrogen oxide ("$NO_X$") to .3 lbs per million BTU.  A stay will prevent ATLP from resolving the injunctive claims of the USEPA.

In its February 10, 2009 Opinion (Exhibit E heret), at pages 7-8, the Bankruptcy Court noted the substantial progress between ATLP and the USEPA:

> Notwithstanding that this Court's determination of these two issues cannot address the current controversy between the Debtor and the USEPA, this Court heard the testimony of both the Debtor's and the City's experts addressing both the technical aspects of whether Boiler 32 should be considered a new source or a "grandfathered" facility and the competing interpretations of the Clean Air Act on this issue.  This Court found the Debtor's experts to be far more persuasive and can only predict that, should the open issues between the Debtor and the USEPA be litigated, the court with jurisdiction to actually determine those issues likewise would be persuaded by the Debtor's experts and environmental counsel.  Long prior to any such litigation, this Court anticipates that the USEPA will resolve these open issues with the Debtor, taking into account the minor differences (92% vs. 90%) that separate them on certain issues and the impossibility of any operator of the Leased Premises being able to afford the equipment that the City views as the best available technology.

> That the Debtor has been engaged in ongoing and partially successful discussions with the USEPA is plain.  The sense and sensibility of the USEPA in these negotiations already has been evinced in its settlement of its alleged administrative claim for an amount that now is less than 1/500th of its opening demand.  In considering whether the City's view of the environmental issues weighs in favor of issuing a stay pending appeal, this Court concludes that the City's record evidence on these issues will not cause a reviewing court to reverse the Confirmation Judgment.

**9.**     **According to the City, Issuance of a Stay Could Cause it Harm.**

The City has claimed that it too may be liable for civil penalties.  In fact, during closing argument, counsel for the City argued that ATLP's civil penalty, as calculated by USEPA was in excess of $450 million and that, presumably, the exact same calculation applies to the City.  *See*

Oral Recording of October 3, 2008 Closing Argument.  If the City is correct, issuance of a stay which thereby precludes the occurrence of an Effective Date, could result in harm to the City.

### 10.     Issuance of a Stay Precludes the Ability to Pursue Coal Gasification.

In late 2007 and early 2008, ATLP and certain outside firms actively pursued coal gasification.  If implemented, coal gasification would resolve USEPA's claims for injunctive relief and provide a stable basis for ATLP's operations for many years.  In early 2008, the firms that were evaluating this coal gasification notified ATLP that they were not going to pursue such a program at ATLP's facility.  The decision was based upon timing constraints and the number of unresolved items.  The main timing constraint was that to realize the tax credits, which is the key to the economics of coal gasification, the equipment had to be installed and operating by December 31, 2008.  Given the time it would take to order and install the equipment, as well as the many unresolved issues in this bankruptcy process, the firms decided not to pursue coal gasification.

As part of the Emergency Economic Stabilization Act of 2008, signed into law on October 3, 2008, the deadline for installation and operational effectiveness has been moved to December 31, 2009.  *See* H.R. 1424, Division B, Energy Improvement and Extension Act of 2008, Section 101(a) (extending the credit under section 45(d)(8) of the Internal Revenue Code, 26 U.S.C. § 45(d)(8), by striking January 1, 2009 and inserting January 1, 2010).  *See also,* 26 U.S.C. § 45(c)(7) for the definition of refined coal, which would be applicable in connection with coal gasification at ATLP's facilities.  If coal gasification can be implemented, ATLP, its creditors and the entire community will benefit.  Issuance of a stay would again undermine the possibility of coal gasification.

11.     **Issuance of a Stay Delays Payments to Creditors.**

Under the Plan, certain creditors are to receive payments on or shortly after the Effective Date.  Those include a payment of $150,000 to the State of Ohio in Class 2.1; creditors in Class 3.1; and administrative claims (in excess of $500,000) under Article III of the Plan.  All other payments are tied to the Effective Date.  As noted before, a stay may cause the Plan to fail altogether.  Even if it does not fail, at a minimum a stay results in a delay to all the remaining creditors under the Plan, in excess of $3.5 million, while one party – the City – appeals.  That is real harm to those parties.

One court has recently observed:

> Significant delay in the administration of an estate, however, generally satisfies the criterion of harm to other parties. *In re Lickman*, 301 B.R. at 748 (citing *In re Bob Hamilton Real Estate*, 164 B.R. 703, 705 (Bankr. M.D. Fla. 1994) and *In re Bilzerian*, 264 B.R. 726, 735 (Bankr. M.D. Fla. 2001)).

> Delay in the distribution to creditors under a plan constitutes "substantial harm to other parties."  *In re Baker*, 2005 WL 2105802, at *10 (E.D.N.Y. 2005).  *See also In re Salvo*, 2008 WL 938585, at *4 (Bankr. N.D. Ohio 2008) (A "stay could injure all creditors by delaying their potential payments through a confirmed Chapter 13 plan.") and *In re The Charter Company*, 72 B.R. at 72 (Claimants will "suffer substantial harm as a result of a stay because of the resulting delay in their receipt of settlement funds.").

*F.G. Metals*, 390 B.R. at 478.  *See also Public Service*, 116 B.R. at 350 ("delay caused to creditors receiving their payments is also a significant harm warranting denial of a stay")(citing *Great Barrington*, 53 B.R. at 240).

12.     **Issuance of a Stay Will Result in Higher Administrative Costs.**

Issuance of a stay will result in higher professional fees and other administrative costs.  ATLP has already incurred over $3.5 million in professional fees.  *See* Monthly Operating

Report for the Period Ended December 2008, filed January 20, 2009 [Docket No. 566].  Another year of litigation will result in substantial additional fees.

### Conclusion

In this case, the harm to others that would result from a stay compels denial of the Stay Motion.  A delay in consummation of the Plan would jeopardize the Plan itself.  Further, even if the Plan might proceed, the delay would cause great harm to ATLP and all of its creditors, by delaying and creating uncertainty in distributions to creditors and the ability of ATLP to emerge and resolve environmental and other contractual and public utility matters.  Over 40 jobs will be placed at risk.  The delay will also unnecessarily consume estate resources to the detriment of ATLP, its creditors and customers.  In this case, the equities clearly dictate that the Stay Motion be denied.

**D.**  **A Stay Would Harm the Public Interest**

"To establish this factor the movant must show that a stay would further the public interest."  *In re Lickman*, 301 B.R. 739, 749 (Bankr. M.D. Fla. 2003), *citing In re Brown*, 290 B.R. 415, 424 (Bankr. M.D. Fla. 2003).  "There is a recognized public interest in allowing a Chapter 11 debtor an opportunity to implement its confirmed plan."  *F.G. Metals*, 390 B.R. at 478.  The City must overcome the presumption that there is a "'great public policy in ensuring that . . . [a] bankruptcy case continue to an orderly, efficient resolution to maximize and preserve the estate's assets.'"  *In re Bankruptcy Appeal of Allegheny Health, Educ. and Research Found.*, 252 B.R. 309, 331 (W.D. Pa. 1999); *Lickman*, 301 B.R. at 749; *In re Lazarus Burman Assocs.*, 161 B.R. 891, 901 (E.D.N.Y.) (citing *In re Northlake Building Partners*, 41 B.R. 231, 234 (Bankr. N.D. Ill. 1984) ("the public interest, in the context of a bankruptcy proceeding, is in promoting a successful reorganization.").  Moreover, "the public interest requires bankruptcy

courts to consider the good of the case as a whole, and not individual creditors' investment concerns." *Adelphia*, 368 B.R. at 284.

In a similar context, one court has noted:

> Denial of the stay will allow the Plan to be consummated. The consummation of the Plan will produce a viable, ongoing business which is consistent with and promotes the underlying purposes of Chapter 11 of the Bankruptcy Code. Additionally, numerous jobs at 143 convenience stores will be saved at a time in which there are practically daily headlines trumpeting the loss of additional jobs.

*Convenience*, 290 B.R. at 568.

Issuance of a stay in this case would be extraordinarily harmful to the public at large. The Plan itself will be jeopardized. Over 40 jobs will be placed at risk. Three hospitals, the University and a significant number of businesses and residents of the City of Akron rely upon ATLP for steam and hot water utility service. In *Public Service Co.*, the court denied a stay of an order confirming a plan of reorganization of a public utility, noting the potential harm to the public:

> In *In re Dakota Rail, Inc., supra*, at 823, the court found a stay would hurt "the public interest of continued rail service." Although the public utility involved in the present case will continue to operate, a stay would hurt the public interest in ensuring predictable rates for the great majority of electric power users in the State of New Hampshire. Presently, there is a rate agreement making rates charged to commercial, industrial and individual consumers fairly certain and affordable. A stay, however, would jeopardize any financing of a plan of reorganization, and thus make rates unpredictable. Predictability of electric power rates is a significant factor in maintaining a stable economy in the State.

116 B.R. at 350. The City has not pointed to any public interest that would be furthered by a delay in the implementation of the Plan. To the contrary, implementation of the Plan will enable ATLP to continue to provide reliable utility service to three hospitals, the University and the residents of the City of Akron. Granting a stay pending appeal would harm the public interest.

## IV.     POSTING OF *SUPERSEDEAS* BOND

Even if the City had established the elements needed to obtain a stay – which it has not – the Court should require the City to post a substantial bond.  The City is totally silent on this point.  The City was likewise silent on this point before the Bankruptcy Court.  *See* February 10, 2009 Opinion (Exhibit E hereto) at 14.  This is yet another basis on which the Motion for Stay should be denied.

District Judge Scheindlin described the bond issue in the *Adelphia* case (which involved an attempt to stay consummation of a confirmed plan):

> Under Bankruptcy Rule 8005, a district court has the discretion to grant a stay of a judgment, order or decree of a bankruptcy judge without the posting of a supersedeas bond.  In determining whether a bond should be ordered, the court looks to whether the bond would be necessary to protect "against diminution in the value of property pending appeal" and to "secure the prevailing party against any loss that might be sustained as a result of an ineffectual appeal."  Moreover, the posting of a bond "guarantees the costs of delay incident to the appeal."  **In analyzing whether to order movants to post a bond in support of a stay pending an appeal of a bankruptcy court order, district courts have obtained guidance from Federal Rule of Civil Procedure 62(d), which requires appellants to post a bond when appealing a lower court order absent "exceptional circumstances."**  The policy behind ordering the posting of a bond in that context was recently articulated by this Court:

>> Because a supersedeas bond is designed to protect the appellee, the party seeking a stay without bond has the burden of providing specific reasons why the court should depart from the standard requirement of granting a stay only after posting of a supersedeas bond in the full amount of the judgment.  The bond requirement should not be eliminated or reduced unless doing so "does not unduly endanger the judgment creditor's interest in ultimate recovery."

> The same reasoning applies when a district court is called upon to exercise its discretion as to whether to require a bond in support of a stay of an order of a bankruptcy court.  **If a stay pending appeal is likely to cause harm by diminishing the value of an estate or**

> **"endanger [the non-moving parties'] interest in the ultimate recovery," and there is no good reason not to require the posting of a bond, then the court should set a bond at or near the full amount of the potential harm to the non-moving parties.**

361 B.R. at 350-51 (emphasis added, footnotes omitted).

In *Adelphia*, the District Court considered the following categories of potential loss in arriving at the bond amount of $1.3 billion for a stay pending appeal of a confirmation order:

> (1)  accruing interest on debt obligations;
>
> (2)  contractual arrangements that could become harmed through delayed implementation of the confirmation plan;
>
> (3)  accruing professional and audit expenses;
>
> (4)  additional harms that are substantial but not easily quantifiable, such as the risk that the Plan will fall apart.

361 B.R. at 352-54.

As detailed above, ATLP, its creditors, and its customers will be damaged if a stay is granted.  Each of these harms must be considered in setting the bond amount, which should be set "at or near the full amount of the potential harm."  *Adelphia*, 361 B.R. at 350-51.

To recapitulate, the potential harms include, but are not limited to, the following:

1.  The resolution of USEPA's administrative claim is conditioned upon the Effective Date occurring by a date certain.  Presuming that date is March 31, 2009, a stay would ensure that that date could not be met.  For a period of 32 months (the Petition Date through February 18, 2010), the statutory penalties could be $31,633,333.  *See* Section III(C)(7) above.

2.  Issuance of a stay places the State of Ohio, Summit County, unsecured creditors and various administrative claimants at risk of non-payment.  The total to be paid to the State of Ohio, Summit County and the unsecured creditors is in excess of

$3,500,000.   The total to be paid in administrative claims is in excess of $500,000.

3.      Issuance of a stay will lead to further professional fees.  Based on the fees thus far, it is likely that additional fees will be on the order of $1 million.

4.      Issuance of a stay precludes ATLP's ability to obtain working capital of approximately $700,000.  *See* Section III(C)(4) above.

5.      Issuance of a stay delays collection of an additional $135,000 per year from Canal Place, Ltd.; $100,000 from the Landings; and additional revenue from others.  *See* Section III(C)(5) above.

The sum total of the foregoing is over $37 million.  This is just a portion of the harm that could be caused by issuance of a stay.  Thus, if a stay is granted, the City should be required to post a bond of not less than $37 million.

## V.      <u>CONCLUSION</u>

In the Stay Motion, the City seeks, yet again, to derail ATLP's reorganization without any legitimate basis or economic purpose, and seeks to impose its will upon all others who have agreed to or support the Plan.  The Court should deny the City's Stay Motion.  Alternatively, if the Court is disposed to grant the Stay Motion, the City should be required to post a *supersedeas* bond in an amount of at least $37 million, which is the amount needed to protect ATLP and its creditors from the harms that will be caused by issuance of the stay.

Dated:  February 12, 2009        Respectfully submitted,

        SCHOTTENSTEIN, ZOX & DUNN CO., LPA


/s/ Daniel R. Swetnam
| | |
|---|---|
| Daniel R. Swetnam | (0011022) |
| Tyson A. Crist | (0071276) |

250 West Street, Suite 700
Columbus, OH  43215
(614) 462-2700; Fax:  (614) 462-5135
Email:   dswetnam@szd.com
        tcrist@szd.com

    and

| | |
|---|---|
| M. Colette Gibbons | (0003095) |
| Robert M. Stefancin | (0047184) |

1350 Euclid Ave., Suite 1400
Cleveland, OH 44115
(216) 394-5068; Fax:  (216) 394-5085
Email:   cgibbons@szd.com
       rstefancin@szd.com

*Attorneys for Akron Thermal, Limited Partnership, Appellee*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this 12th day of February 2009, the foregoing *Memorandum of Akron Thermal, Limited Partnership in Opposition to the City of Akron's Motion for Stay Pending Appeal* was filed with the Court via the ECF system and was served by the ECF system or by email upon the parties set forth on the attached Service List.

/s/ Daniel R. Swetnam_____
Daniel R. Swetnam

## SERVICE LIST

Richard G. Hardy, Esq.
Matthew A. Salerno, Esq.
Ulmer & Berne LLP
Skylight Office Tower
1660 W. 2nd Street, Suite 1100
Cleveland, OH 44113-1448
Phone: 216/583-7000
Fax: 216/583-7001
Email: rhardy@ulmer.com
Email: msalerno@ulmer.com
*Counsel for City of Akron*

Eric E. Skidmore, Esq.
Archie W. Skidmore, Esq.
Brian K. Skidmore, Esq.
Skidmore & Associates Co., LPA
1 Cascade Plaza, 12th Floor
Akron, Ohio 44308-1136
Phone: 330/253-1550
Fax: 330/253-9657
Email: ees@skidmorelaw.com
Email: aws@skidmorelaw.com
Email: bks@skidmorelaw.com
*Counsel for City of Akron*

Thomas A. Skidmore, Esq.
Thomas A. Skidmore Co., LPA
1 Cascade Plaza, 12th Floor
Akron, Ohio 44308-1136
Phone: 330/379-2745
Email: thomasskidmore@rrbiznet.com
*Counsel for City of Akron*

Steven D. Bell, Esq.
Steven D. Bell Co., L.P.A.
Millside Centre, Suite 11
8803 Brecksville Road
Brecksville, OH 44141
Phone: 216/925-5484
Fax: 216/925-5480
Email: steve@stevebell-law.com
*Counsel for City of Akron*

Joseph F. Hutchinson, Esq.
Kelly S. Burgan, Esq.
BAKER & HOSTETLER, LLP
3200 National City Center
1900 E. Ninth Street
Cleveland, OH 44114-3485
Telephone: (216) 621-0200
Facsimile: (216) 696-0740
Email: jhutchinson@bakerlaw.com
Email: kburgan@bakerlaw.com

*Counsel for the Committee of
Unsecured Creditors*

Donn D. Rosenblum, Esq.
Principal Assistant Attorney General
Attorney General of Ohio
150 E. Gay Street, 21st Floor
Columbus, OH 43215
Phone: 614/728-5754
Fax: 877/591-5768
Email: drosenblum@ag.state.oh.us
*Counsel for the Treasurer of the
State of Ohio, Ohio Department of Taxation, Office
of Consumers' Counsel, Department of Commerce,
Division of Industrial Compliance and Department of
Transportation*

Victoria D. Garry, Esq.
Assistant Attorney General
Office of the Ohio Attorney General
1600 Carew Tower, 441 Vine Street
Cincinnati, OH 45202
Phone: 513/852-1536
Fax: 513/852-3484
Email: vgarry@ag.state.oh.us
*Counsel for the Treasurer of the
State of Ohio, Ohio Department of Taxation, Office
of Consumers' Counsel, Department of Commerce,
Division of Industrial Compliance and Department of
Transportation*

Office of the U.S. Trustee
Attn: Lenore Kleinman
Howard M. Metzenbaum U.S. Courthouse
201 Superior Ave., East - Suite 441
Cleveland, OH 44114
Phone: 216/522-7800
Fax: 216/522-7193
Email: Lenore.Kleinman@usdoj.gov

John Winship Read, Esq.
J. Bruce Hunsiker, Esq.
Elizabeth A. Ratliff, Esq.
Vorys, Sater, Seymour and Pease, LLP
2100 One Cleveland Center
1375 E. Ninth Street
Cleveland, OH 44114-1724
Phone: 216/479-6103
Fax: 216/479-6060
Email: jwread@vorys.com
Email: jbhunsicker@vorys.com
Email: earatliff@vorys.com

Ira Herman, Esq.
THOMPSON & KNIGHT, LLP
919 Third Avenue, 39th Floor
New York, NY  10022-3902
Telephone:  (212) 751-3045
Facsimile:  (214) 999-9139
Email:  ira.herman@tklaw.com