UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| *In re*: | ) | |
| | ) | |
| AKRON THERMAL, LIMITED | ) | Case No.: 5:09 MC 10 |
| PARTNERSHIP, | ) | |
| | ) | |
| Debtor and | ) | |
| Debtor-in-Possession. | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| CITY OF AKRON, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AKRON THERMAL, LIMITED | ) | |
| PARTNERSHIP, | ) | |
| | ) | |
| Appellee | ) | <u>ORDER</u> |

Bankruptcy Court Chief Judge Marilyn Shea-Stonum ("Bankruptcy Court") issued an

opinion ("Confirmation Opinion") confirming Akron Thermal, Limited Partnership's ("Debtor")

Modified Second Amended Plan of Reorganization ("Plan") on January 26, 2009. (Case No. 07-

51884, "Bankr. Dkt.," ECF No. 567.)  On February 10, 2009, the Bankruptcy Court denied

Appellant City of Akron's ("City") Motion for Stay Pending Appeal with the District Court and

Request for Expedited Hearing, wherein the City sought to preclude the Debtor from implementing

the Plan.  ("Bankruptcy Order," Bankr. Dkt., ECF No. 581.)

Now pending before the court is the City's Emergency Motion for Stay Pending Appeal of Appealed Orders[1] with the District Court and Request for Expedited Hearing and Reduced Notice Pursuant to Bankruptcy Rules 8005 and 8011 ("Motion to Stay"), which was filed in the Northern District of Ohio and originally assigned to Judge Economus on February 10, 2009. (ECF No. 1). The case was re-assigned to Judge Oliver for further proceedings on February 12, 2009.  (Order, ECF No. 9.)  That day, the Treasurer of Ohio, the Office of Consumers' Counsel, the Ohio Department of Taxation, the Ohio Department of Commerce, and the Ohio Department of Transportation (collectively, "State of Ohio") and the Official Committee of Unsecured Creditors ("Unsecured Creditors") filed briefs in opposition to the City's Motion to Stay.  That same day, the court conducted, on the record, a telephonic conference on the Motion to Stay and heard arguments from: (1) counsel for the City; (2) counsel for the Debtor; (3) counsel for the Unsecured Creditors; (4) counsel for the State of Ohio; and (5) counsel for Thermal Venture II.  The United States Trustee attended the telephonic conference but did not assert any legal arguments in support of or opposition to the Motion.  For the following reasons, the court denies the City's Motion.

---

[1]     These Appealed Orders are: (1) January 31, 2008, Oral Ruling regarding the issues of Lease termination and extension ("1.31.08 Oral Ruling"); (2) February 22, 2008, Oral Ruling regarding whether or not a water and sewer delinquency constituted a default under a Lease and a cure item under Bankruptcy Code Section 365 ("2.22.08 Oral Ruling"); (3) April 25, 2008, Partial Opinion on Motion of Debtor and Debtor-in-Possession for Approval of Assumption of the Unexpired Operating Lease Agreement with the City of Akron ("4.25.08 Partial Opinion"); (4) July 25, 2008, Oral Ruling approving disclosure statement ("7.25.08 Oral Ruling"); (5) July 25, 2008, Order Approving Debtor's First Amended Disclosure Statement ("7.25.08 Order"); (6) January 26, 2009, Opinion Re: Confirmation of Modified Second Amended Plan of Reorganization ("Confirmation Order); and (7) January 26, 2009, Entry of Judgment.  (City's Mot. to Stay at 1.)

# I. FACTS

The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on June 18, 2007.  As the Bankruptcy Court noted in its Order denying the City's Motion to Stay ("Bankruptcy Order"), "the procedural history of this case is lengthy and has been adequately summarized in the Confirmation Opinion and in the parties' briefs."  (Bankr. Order at 2, Bankr. Dkt., ECF No. 581.)  In the Confirmation Opinion, the Bankruptcy Judge summarized her understanding of "the history of the leased facilities, and a sketch of the Debtor's pre-filing interaction with the City in its capacity as the Debtor's landlord" as follows:

## A. Debtor's Business

Jeffrey Bees serves as the president of Opportunity Parkway, LLC and Teri Kechler serves as its treasurer. Opportunity Parkway, LLC in turn provides the services of Bees and Kechler, as needed, to the Debtor. Richard Pucak has been the general manager of Debtor since 2000. Debtor employs approximately 43 full-time and 9 part-time employees. Debtor's work force has been stable with low turnover and has demonstrated responsibility and ingenuity.

The Debtor is a public utility that uses facilities leased to it by the City to generate and distribute steam primarily for heating to a variety of customers located in Akron, Ohio. The Debtor provides essential services to customers with critical needs, most significantly, three area hospitals. The physical plant that is central to the provision of steam and chilled water to the Debtor's customers has evolved over a period of almost eight decades. Within the past three years and in an environment in which energy costs have generally outpaced inflation, the Debtor has succeeded in introducing a fuel source that allows it to operate on a very competitive basis. This is essential because two of its largest customers, the University of Akron ("University") and Akron City Hospital ("City Hospital") have the ability to satisfy their own steam needs. If they could do so at a cost that was predictably lower than what they are charged by the Debtor, that portion of Debtor's business would likely evaporate.

Using some of the same facilities, Akron Thermal Cooling, LLC ("ATC"), an entity that shares the same general partner as Debtor, produces and distributes chilled water which is used for air conditioning by various customers located in Akron. ATC did not file a petition for relief in bankruptcy. Both companies are regulated utilities in Ohio. Debtor's leased system includes two adjacent steam

generating plants (the Akron Plant and the BFG Plant), two chilled water plants, and approximately 18 miles of distribution piping that are substantially underground (generally the "Leased Facilities"). ATC uses two chilled water plants. Debtor provides ATC with steam.

Under the Plan, ATC is to contribute its income and earnings to the Reorganized Debtor but is to remain a separate entity to achieve appropriate tax savings. Although not so characterized by any party, the Court views this arrangement as a modified form of substantive consolidation. It is wholly appropriate in this case because of the centrality of the Leased Facilities to the ATC operations and because of past practices. Thus, as discussed below, no value can be attributed to income stream in assessing new value issues.

## B. Leased Facilities

The following history of the Leased Facilities is summarized from the Disclosure Statement.

Ohio Edison installed the central steam distribution system in 1927, expanded it through the 1940's and operated it until 1978 at which time it was turned over to the City. The original Ohio Edison Beech Street steam generation facility was operated until 1979 at which time the City replaced it with the RES Facility (also known as the Akron Plant). By 1982, the City had added a high-pressure steam distribution and condensate return system to expand the area that could be served by the RES Plant and thus its potential customer base. The RES Facility, which has three boilers, was built as a steam generation plant burning refuse-derived fuel (solid waste). When serious problems developed with the use of refuse-derived fuel, the operators resorted to other fuel sources, including the more costly alternative of natural gas. When the Debtor became the operator, it converted the RES Facility so that it could be fueled primarily by wood chips and waste oil. In 2004 and 2005 Debtor developed the capability to use tire-derived fuel ("TDF"), i.e., utilizing used tires as part of its fuel mix at the Akron Plant.

Debtor also operates a coal and gas fired steam generation plant (known as the BFG Plant) consisting of two boilers and associated equipment was originally built by the B.F. Goodrich Tire Company in the 1950's and 1960's. The BFG Plant was connected to the Akron Plant in 1988 by the City to further expand the system.

The chilled water plants, now operated by ATC, were built in the mid-1980's and 1996, respectively.

The distribution and generating assets have been operated, in whole or in part, by Ohio Edison (through 1978), Teledyne National, Inc. (1979-1982), TriCil, Inc. (1982-1984), WTE Corp. (1985-1994) and Debtor (1995-present), albeit with

-4-

a 2004 change in management. In its Lease Assumption Motion, Debtor sought
authority to assume the lease of the system which runs through August 15, 2017.

(Confirmation Opinion at 12-15.)

### C. Procedural History

The Bankruptcy Court has held a number of proceedings and ruled on numerous issues since

the Debtor filed its petition, but three are of particular relevance to the Motion currently before the

court. First, the Bankruptcy Court concluded in its January 31, 2008, Oral Ruling that the City had

not terminated the Lease between the Debtor and the City prior to the Petition Date.   (City's

Emergency Mot. to Stay at 6, citing Jan. 31, 2008, Oral Ruling.)  Second, the Bankruptcy Court

presided over eight days of hearings on the Debtor's Motion for Approval of Assumption of the

Unexpired Operating Lease Agreement with the City.  The Bankruptcy Court subsequently issued

a 43-page Partial Opinion on the Debtor's Motion on April 25, 2008.  The Bankruptcy Court did not

reach a final decision regarding whether the Debtor would be authorized to assume the Lease, but

it did address the following issues:

> (1) whether the term of the Lease has been extended for ten years beyond its initial
> term, which in the absence of renewal would have expired on August 15, 2007; (2)
> the amount of liquidated monetary damages that the Debtor must pay to the City in
> connection with any Lease assumption; and (3) whether there are other obligations
> that the Debtor must undertake to cure existing defaults under the Lease.

(Partial Opinion at 2.) Finally, the Bankruptcy Court conducted nine days of hearing on the Plan and

issued its Confirmation Order confirming the Plan on January 26, 2009.  The Confirmation Order

also held that the Debtor could assume the Lease, rejected the City's contention that various

environmental issues constituted defaults of the Lease, and addressed the release of non-debtor third

parties.

### II.  BANKRUPTCY JUDGE'S ORDER DENYING THE MOTION TO STAY

On February 5, 2009, the City filed their Motion for Stay Pending Appeal.  That day, the Bankruptcy Court scheduled an expedited hearing on the Motion for Stay ("Stay Hearing") for February 6, 2009.  During the Stay Hearing, the Court heard the testimony of Jeffery Bees, as well as the arguments of counsel for the City in support of a stay pending appeal and from counsel for the Debtor, the Unsecured Creditor, and the State of Ohio agencies in opposition to such a stay.

In her Order denying the City's Motion, the Bankruptcy Judge applied the standard set forth in *Michigan Coalition of Radioactive Users, Inc. v. Griepentrog,* 945 F.2d 150, 153-54 (6th Cir. 2001), which governs motions to stay.  The *Griepentrog* standard is set forth below in Section III(A).  (Bankruptcy Court Order at 5-14.) First, the Bankruptcy Judge analyzed the City's argument that the following five issues constituted "serious legal questions," pursuant to the first *Griepentrog* prong:  (1) the Bankruptcy Court erred in holding that the Debtor extended the Lease; (2) the Bankruptcy Court erred in holding that the City failed to terminate the Lease; (3) the Bankruptcy Court erred in holding that the environmental issues in the case did not constitute a default of the Lease; (4) the Bankruptcy Court erred in allowing the release of third parties in the Plan; and (5) the Bankruptcy Court erred in embedding its ruling on the assumption of the Lease in the Confirmation Opinion. (Bankr. Order at 5-9.) The Bankruptcy Court assigned "some weight" to the second issue raised by the City, (*id.* at 7), but concluded that the City did not have a substantial chance of reversal regarding the remaining issues.  (*Id.* at 5-6; 7-9.)

Second, the Bankruptcy Judge found that the City presented no evidence of irreparable harm at the Stay Hearing. (*Id.* at 9.)  The Bankruptcy Judge noted that the City asserted that the existence of irreparable harm could be found in the evidentiary record of the case, but the City failed to direct the Bankruptcy Judge's attention to any particular evidence.  (*Id.*) The Bankruptcy Judge then stated

that the City argued it would be harmed if it were left with the Debtor, an operator with whom it was dissatisfied and which had not met its obligations under the Lease. (*Id.* at 10.) However, the Bankruptcy Judge found that the City's dissatisfaction did not rise to the level of irreparable harm as defined by *Griepentrog* because prepetition payment breaches will be cured under the Plan, and the City neglected to acknowledge that the Plan will provide the City with numerous benefits. (*Id.* at 9-10.) Moreover, the Bankruptcy Court found that the fact that an appeal may become moot if a stay is not granted does not, in itself, establish irreparable harm. (*Id.* at 11.)

Third, the Bankruptcy Judge found that, while the City argued that the Debtor and others would not be harmed if the Bankruptcy Judge granted a stay, the City's assertion was completely at odds with the evidence of harm presented by the Debtor, Unsecured Creditors, and the State of Ohio. (*Id.* at 9-14.) Therefore, the Bankruptcy Judge found that the City failed to demonstrate an absence of harm to other interested parties if a stay was issued. (*Id.* at 14.) Finally, the Bankruptcy Judge found that a stay would not benefit the public interest because consummation of the Plan will make the taxpayers whole on the Lease. (*Id.*)

Therefore, after weighing the four *Griepentrog* factors, the Bankruptcy Judge found that "the considerations weighing on the side of allowing the Debtor to proceed with implementation are far heavier." (*Id.* at 15.) Accordingly, the Bankruptcy Judge concluded that "[t]he City simply has not been able to meet its burden of proof on its Motion for Stay." (*Id.*)

Additionally, the Bankruptcy Court, quoting *In re Adelphia Communications Corporation,* 361 B.R. 337, 346 (S.D.N..Y. 2007), also noted that "the party seeking a stay without bond has the burden of providing specific reasons why the court should depart from the standard requirement of granting a stay only after posting of a supersedeas bond in the full amount of judgment." (*Id.* at 14.)

The Bankruptcy Court found that the City "did not meet its burden of providing any reason why this Court should deviate from the standard requirement of posting a supersedeas bond prior to granting the stay," finding it "yet another example of the City's total lack of evidentiary support for its Motion to Stay." (*Id.* at 15.)

### III. LEGAL STANDARDS

### A. Stay

The Sixth Circuit has recognized that, in determining whether an injunction should be issued pending appeal, a trial court, which in this case was the Bankruptcy Court, should apply "the same four factors that are traditionally considered in evaluating the granting of a preliminary injunction." *Griepentrog,* 945 F.2d at 153. These four balancing factors are: (1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay. *Id.* The City "must address each factor, regardless of its relative strength, providing specific facts and affidavits supporting assertions that these factors exist." *Id.* at 154.

*Griepentrog* stated that, "[i]n essence, a party seeking a stay must ordinarily demonstrate to a reviewing court that there is a likelihood of reversal." *Id.* at 153. However, *Griepentrog* recognized that the balancing of the four factors in the context of an appeal of a preliminary injunction is not identical to the analysis regarding the decision to grant or deny a preliminary injunction:

> To justify the granting of a stay, however, a movant need not always establish a high probability of success on the merits. The probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiffs will suffer absent the stay. Simply stated, more of one excuses less of the other. This

relationship, however, is not without its limits; the movant is always required to demonstrate more than the mere "possibility" of success on the merits. For example, even if a movant demonstrates irreparable harm that decidedly outweighs any potential harm to the defendant if a stay is granted, he is still required to show, at a minimum, "serious questions going to the merits."

*Id.* at 153-54 (internal citations omitted).

### B. Standard of Review

Federal Rule of Bankruptcy Procedure 8005 provides:

A motion for a stay of the judgment, order, or decree of a bankruptcy judge, for approval of a supersedeas bond, or for other relief pending appeal must ordinarily be presented to the bankruptcy judge in the first instance. Notwithstanding Rule 7062 but subject to the power of the district court and the bankruptcy appellate panel reserved hereinafter, the bankruptcy judge may suspend or order the continuation of other proceedings in the case under the Code or make any other appropriate order during the pendency of an appeal on such terms as will protect the rights of all parties in interest. <u>A motion for such relief</u>, or for modification or termination of relief granted by a bankruptcy judge, <u>may be made to the district court or the bankruptcy appellate panel, but the motion shall show why the relief, modification, or termination was not obtained from the bankruptcy judge</u>.

(Emphasis added.)

The parties disagree regarding the standard of review a district court should apply to a bankruptcy judge's denial of a motion to stay pending appeal.  Neither the Supreme Court nor the Sixth Circuit has addressed the appropriate standard of review a district court should apply to a bankruptcy judge's order denying a stay pending appeal.

The Unsecured Creditors cite case law holding that, where a bankruptcy court has considered and ruled on the request for a stay pending appeal, the appropriate standard of review is abuse of discretion.  (Objection of the Unsecured Creditors to City's Motion for Stay Pending Appeal at 2-4, ECF No. 10, citing *In re Target Graphics, Inc.,* 372 B.R. 866, 870 (E.D. Tenn. 2007); *In re Rhoten,* 31 B.R. 572, 577 (M.D. Tenn. 1982);  *In re Grand Traverse Dev. Co. Ltd. P'ship,* 151 B.R. 792,

795-96 (W.D. Mich. 1993); *In re North Plaza, LLC,* 395 B.R. 113, 119 n.5 (S.D. Cal. 2008); *In re Irwin,* 338 B.R. 839, 845-46 (E.D. Cal. 2006); *Rothenberg v. Ralph D. Kaiser Co.,* 200 B.R. 461, 463 (D. D.C. 1996); *In re Stratford Hotel,* 120 B.R. 515, 517-18 (E.D. Mo. 1990); *In re Wymer,* 5 B.R. 802, 809 (9th Cir. BAP 1980)). While the court recognizes that these cases are not binding authority upon this court, the court finds them, after a full review of the cases cited by the Unsecured Creditors and the City, to be persuasive.

The City argues that the Emergency Motion of Stay Pending Appeal is not an appeal of the Bankruptcy Judge's denial of a stay pending appeal, but is rather an independent motion to be reviewed *de novo.* (City Mem. Regarding Standard of Review at 1.) First, the City argues that the plain language of Rule 8005 supports its interpretation because Rule 8005 refers to a party filing a "motion," rather than an "appeal," before the district court. (*Id.* at 2-3.) Additionally, the City cites several cases that it claims "have rejected the interpretation that a district court reviews a motion for stay pending an appeal under an appellate perspective." (*Id.* at 4, citing *In re Adelphia Commun. Corp.,* 361 B.R. 337, 346 (S.D.N.Y. 2007); *WCI Cable, Inc. v. Alaska R.R. Corp.,* 285 B.R. 476, 478 (D. Or. 2002) (citing *In re First South Sav. Ass'n,* 820 F.2d 700, 709 (5th Cir. 1987); *In re National Gypsum Co.,* 2000 U.S. Dist. LEXIS 19482, at *8 (N.D. Tex. Sept. 29, 2000)).

The court does not find either of the City's arguments to be persuasive. First, the court notes that the *In re Irwin* court persuasively rejected the argument that the plain language of Rule 8005 compels a district court reviewing a bankruptcy court's order denying a motion to stay pending appeal to make a completely independent evaluation, finding that:

> Bankruptcy Rule 8005 explicitly provides that "the motion shall show why the relief, modification, or termination was not obtained from the bankruptcy judge." Inherent in the motion is a requirement that the moving party provide a record of the bankruptcy court's actions (be it contained in a formal order or otherwise) for

-10-

review.  There is no contradiction in applying an appeals standards to these motions for stays.

*In re Irwin,* 338 B.R. at 846.

Second, the court does not find the cases cited by the City in support of its position to be persuasive.  Specifically, this court shares the opinion of the *In re Irwin* court that *WCI Cable* and *In re First South Savings Association* are of limited value because both are procedurally distinguishable from the issue presented here:

> The District of Oregon opinion [*WCI Cable*] was not on a motion to stay a bankruptcy court's order pending appeal under Bankruptcy Rule 8005; instead it dealt with a motion to stay a withdrawn matter (already before the district court) pending appeal of a collateral decision in the bankruptcy court. In the Fifth Circuit case [*In re First South Savings Assoc.*], the court noted the special procedural background of the case before it: "[the district] court was confronted with the task of determining the propriety of a stay in an emergency context, without the benefit of the reasons underlying the bankruptcy court's denial of the request for a stay."

*In re Irwin,* 338 B.R. at 846-47.

Moreover, *In re National Gypsum* is also distinguishable from the instant case because the motion to stay pending appeal at issue in that case appears to have been presented to the district court in the first instance.  2000 U.S. Dist. LEXIS 19482 at *7-8.  Finally, *Adelphia* is unpersuasive because the district court's statement that, "the decision as to whether to issue a stay of an order pending appeal lies within the sound discretion of the district court," 361 B.R. at 346, directly conflicts with the district court's observation that "the district court stands in the same relation to the bankruptcy court as does the circuit court to the district court when a party seeks a stay of a district court order." *Id.*

Accordingly, based on the persuasive rationale underlying the case law cited by the Unsecured Creditor, the court holds that the appropriate standard of review in the instant case is

-11-

abuse of discretion.  In so holding, the court also finds that "the abuse of discretion standard on review of the bankruptcy court's order denying a stay encompasses a *de novo* review of the law and a clearly erroneous review of the facts with respect to the underlying issues." *In re North Plaza,* 395 B.R. at 113 (citing *In re Irwin,* 338 B.R. at 844); *see also In re Stratford Hotel Co.,* 120 B.R. at 517 ("In determining whether the bankruptcy court abused its discretion in denying the stay based on its assessment of the application of these four factors to the present case, this Court may review its legal conclusions *de novo,* but its factual conclusions must be upheld unless clearly erroneous.").

## IV. LAW AND ANALYSIS

The sole issue this court must determine is whether the Bankruptcy Court abused its discretion in denying the City's Motion for a Stay Pending Appeal.  For the reasons stated below, the court denies the City's Motion for a Stay based on its finding that the Bankruptcy Court did not abuse its discretion in denying the City's Motion to Stay.

### A. Likelihood That the City Will Prevail on the Merits of the Appeal

As summarized above in Section II, the Bankruptcy Court considered five matters identified by the City as presenting serious and substantial legal matters, which the City again raises before this court.  Additionally, the City now argues additional serious legal questions merit a stay, *i.e.,* the Debtor's deficient maintenance of the facility. (*See* Mot. at 18-26.)  However, since the City failed to raise this issue in its Motion to Stay before the Bankruptcy Court, the court declines to address it now on appeal.  Therefore, the court shall confine its analysis to the five arguments presented to and addressed by the Bankruptcy Court in its ruling denying the Motion to Stay.

#### 1. Extension of the Lease

In its Motion to Stay before the Bankruptcy Judge, the City first objected to the Bankruptcy

Court's decision regarding the extension of the Lease, arguing that the Debtor's attempt to exercise a right to extend the Lease term was unenforceable and void because the Debtor was in substantial default of the Lease.  The  City maintained that, under Ohio law,  it is implicit that the Debtor must be in compliance with the Lease terms to exercise an option to renew/extend.  The Bankruptcy Court rejected the City's argument as follows:

> First is this Court's finding that there is no language in the Lease requiring the lessee to be current with its obligations under the contract at the time that it gave notice of its exercise of the option to extend the Lease for the one ten-year option period. The City has argued that this Court should fill that contractual void. Applying the parties' choice of law, Ohio law, there is long-standing authority that, when sophisticated parties have included an integration clause in their contract, courts should not supply terms that the parties did not. *Bd. of Trustees of Union Twp. Planned Devel. Co. of Ohio,* 2000 WL 1818540 *7 (Ohio App. 12th Dist. Dec. 11, 2000); *Truetries Svc. Co. v. Hager*, 691 N.E.2d 1112, 1115 (Ohio Ct. App. 8th Dist. 1997); *Aultman Hosp. Ass'n v. Comty. Mut. Ins. Co.,* 46 Ohio St. 3d 51, 53-54 (Ohio 1989).  The single, unreported decision from an intermediate Ohio appellate court on which the City relies, *Horn v. LaPille,* 984 WL 6969 (Ohio App. 1 Dist. 1984), has been fully addressed in the Oral Ruling of January 31, 2008.

(Bankruptcy Order at 5-6.)  Therefore, the Bankruptcy Court concluded that "the likelihood of reversal on this question is not substantial." (*Id.*)  Accordingly, upon review of the relevant case law and pertinent facts in this case, the court finds at this juncture that the Bankruptcy Court  correctly concluded that the City did not demonstrate it was likely to prevail on the merits of an appeal on this issue.

2. Termination of Lease

Second, the City argued before the Bankruptcy Court that the court erred as a matter of law in finding that the City's attempt to terminate the Lease prior to the Petition Date was not effective any earlier than June 19, 2007, the day after the Debtor filed its petition, and that the Bankruptcy Court also erred in not concluding that the notice of termination should be allowed to operate

-13-

according to its terms in the post-petition time frame.  In addressing this argument, the Bankruptcy

Court stated:

> Only the nonpayment of rent and franchise fees constituted breaches of the Lease.
> In seeking to reorganize under Chapter 11, to assume the Lease and to cure all
> monetary breaches with interest under the Lease, and now having the capacity to do
> so pursuant to the terms of the Plan, the Debtor has acted to make the City whole
> with respect to those monetary breaches.  Since the Petition Date, the Debtor has
> worked diligently to improve the condition of the Leased Premises. Against that
> background, the Debtor cites to the examination of Ohio law, its abhorrence of lease
> forfeiture, and its recognition of the ability of courts to provide relief from forfeiture
> set forth in *In re 1345 Main Partner, Ltd.*, 215 B.R. 536, 541 (Bankr. S.D. Ohio
> 1997) (citing *In re Fry Bros. Co.*, 52 B.R. 169 (Bankr. S.D. Ohio 1985), relying in
> turn upon *Peppe v. Knoepp*, 103 Ohio App. 223, 140 N.E.2d 26 (1956)). As the
> Court learned in a hearing on a motion for preliminary injunction in an adversary
> proceeding related to this case, *ATLP v. The Community Fall Foundation, Inc.*, Adv.
> Pro. No. 07-5131, the City was assigning or at least purporting to assign portions of
> its payment rights to other entities.

(Bankruptcy Order at 6.)

The Bankruptcy Judge found this to be a serious issue "that can be viewed through a variety

of lenses."  (*Id.* at 7.)  As a result, the Bankruptcy Judge assigned some weight to the City's

argument that the Lease was terminated, concluding that "[t]his Court cannot predict whether the

City would succeed in obtaining a reversal of this Court's holdings on appeal." (*Id.*)

The court finds that the Bankruptcy Court's factual finding that the Lease had not been

terminated prior to the petition on June 18, 2007, was not clearly erroneous in light of the City's

notice which stated that the City "hereby terminates said Agreement effective Tuesday, June 19,

2007."  Moreover, even if the termination set forth in the Notice became effective subsequent to the

Petition Date, as the City relies upon *Moody v. Amoco Oil,* 734 F.2d 1200, 1213 (7th Cir. 1984) to

contend, the City failed to show in its Motion to Stay that "termination [was] complete <u>and not

subject to reversal</u>, either under the terms of the contract or under state law."  *Moody v. Amoco Oil*

-14-

*Company,* 734 F.2d 1200, 1212 (7th Cir. 1984) (emphasis added); *see  also In re 1345 Main Partner,* 215 B.R. at 541 (restoring, after balancing the equities, the debtor's nonresidential lease agreement that terminated prior to the debtor's bankruptcy filing).  Therefore, the court finds that the City has not  shown that it is likely to prevail on this issue on appeal.

<u>3. Environmental Issues</u>

The City objects to the Bankruptcy Judge's resolution of certain environmental issues in the Confirmation Opinion, arguing that these environmental issues constitute a default of the Lease.  In the Confirmation Opinion, the Bankruptcy Judge noted that the City had previously argued that the Debtor is in default of Section 4.2 of the Lease based on the fact that the Debtor received a notice of Violation from the U.S. EPA alleging that Boiler 32 was being operated in violation of the Clean Water Act.  (Conf. Op. at 34.)  However, the Confirmation Opinion reiterated the Bankruptcy Court's previous holding, set forth in its Partial Opinion, that: "Unless and until U.S. EPA institutes an enforcement action and [the Debtor] is the subject of a final decision finding a violation of the Clean Air Act, there is no default."  (*Id.*, citing Partial Opinion at 42.)

Additionally, the City argued that the Notice of Violation ("NOV") issued to the City by the United States Environmental Protection Agency ("EPA") on September 17, 2008, constitutes an additional default under the Lease.  (Confirmation Op. at 34.)  Based on its previous holding that "an NOV does not have the force of a law, regulation, order, or other requirement,"(*id.,* citing Partial Op. at 41), the Bankruptcy Court held that "unless and until there is an enforcement action against the City ***and*** the City is the subject of a final decision finding a violation of the Clean Air Act, there is no default under the Lease and Debtor is not obligated to indemnify and defend the City, either for its costs incurred as a result of the NOV or any subsequent action."  (Confirmation Op. at 34,

emphasis in original.)

Finally, the Bankruptcy Court rejected the City's argument that the 2008 NOV from the EPA constituted an "Environmental Condition" as defined by the Operating Lease. (*Id.* at 35-36.) In addressing this argument, the Court noted that:

> The City's assertion that the NOVs issued to it and the Debtor constitute an Environmental Condition requires this Court to examine the origin of the phrase used in Section 37.2 of the Lease. The words "presence, use, generation, storage, transportation, treatment, recycling, reuse, reclamation, disposition, handling or release of any Contaminant" in the definition of "Environmental Condition" in Section 37.2 of the Lease tracks such language in the federal Resource Conservation and Recovery Act ("RCRA") and the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), which statutes address, inter alia, liability for the presence, generation, handling, storage, disposal and release of hazardous substances, not the requirements of the Clean Air Act, which uses the term "emission" of air pollutants. Because the NOVs are not an Environmental Condition, they do not trigger the Debtor's obligation to indemnify the City under Section 38(b) of the Lease.

(Confirmation Op. at 36.)

In the Motion to Stay before the Bankruptcy Judge and before this court, the City fails to explain the basis for its apparent argument that the Bankruptcy Court incorrectly resolved these environmental issues. Accordingly, the court finds that the City fails to show a likelihood of success of reversal on the merits of this issue on appeal.

### 4. Release of Third Parties

Fourth, the City objected to the release of third parties on its Motion to Stay before the Bankruptcy Court. The entirety of the City's argument of this issue before the Bankruptcy Court is set forth below:

> As discussed further below, the City has a cause of action against TVII for guarantee of [Debtor's] liabilities to City. Failure to grant a stay of the confirmation order - which allows third-party releases, would essentially defeat the City's claim against TVII and its ability to pursue the guarantee.

-16-

(City's Mot. to Stay before the Bankr. Ct. at 16.)

In rejecting the City's argument, the Bankruptcy Court observed that "[t]he City completely fails to develop this issue."  The Bankruptcy Court concluded it was "not in a position to further address the matter in this procedural context," *see Griepentrog*, 945 F.2d at 153-54.  The City makes the same argument, verbatim, on this issue that it made before the Bankruptcy Court.  Based on the City's failure to develop this issue, the court finds the City fails to show that it is likely to succeed on the merits of its appeal on this issue.

### 5. Embedding the Lease in the Confirmation of the Plan

Fifth, the City argued in its Motion to Stay before the Bankruptcy Court that it erred, pursuant to § 365(d)(4)(A), by embedding its ruling on assumption of the Lease in its Confirmation Opinion.  Specifically, the City argued before the Bankruptcy Court and now makes the verbatim argument before this court, that:

> It is obviously contemplated by Section 365(d) that the 120- day period within which a debtor is required to assume a lease of nonresidential real property may expire after, or in close time proximity to the entry of an order confirming a plan, such that the debtor must assume the lease upon the earlier of these two events to occur. Congress obviously considered the timeframe under which debtors are required to assume leases of noncommercial real property and enacted Section 365(d)(4)(A) of the Bankruptcy Code and provided for separation of lease assumption and confirmation in the event the later would occur prior to 120 days after the date of the order of relief.

(City's Mot. to Stay at 15-15.)

In rejecting the City's argument, the Bankruptcy Court found it was  " based upon a contorted reading of § 365(d)(4)(A)."  (Bankr. Order at 8.)  The Bankruptcy Court found that "the City confuses the deadline for a debtor to seek authority to assume a lease with the time that a court may reasonably take in the circumstances of a particular case to determine the issue."  (*Id.*)  The

-17-

court found that this argument "simply ignores the discretion that bankruptcy courts must have in managing their dockets" and noted that "[t]he deadline in § 365(d)(4)(A) is not a deadline for the court's determination of this issue." (*Id.*) Accordingly, the court concluded "[t]his issue does not add any weight to the City's case for a stay pending appeal." (*Id.* at 8-9.)

The court finds that the Bankruptcy Court's correctly concluded that "[t]he deadline in § 365(d)(4)(A) is not a deadline for the court's determination of this issue," and this conclusion is supported by persuasive case law. *See, e.g., In re Burns Fabricating Co.,* 61 B.R. 955, 956 (Bankr. E.D.Mich. 1986) ("[I]t is clear then that the 60-day period of section 365(d)(4) refers to the time in which the trustee or debtor must decide to assume or reject, and not the time in which the entire process must be completed"); *In re Delta Paper Co., Inc.,* 74 B.R. 58, 59-60 (Bankr. E.D. Tenn. 1987). Accordingly, the court finds that the City is not likely to succeed on the merits of its appeal on this issue.

## B. Irreparable Injury

The Bankruptcy Court noted in its Order denying the City's Motion to Stay that the City presented no evidence of irreparable harm at the Stay Hearing, and instead merely asserted that evidence of irreparable harm could be found in the evidentiary record of the case. Yet, the Bankruptcy Judge noted that, "[i]n making this assertion, the City did not bother to direct this Court's attention to any particular evidence that had been admitted previously. Thus, the City not only failed to carry its burden on this element, it made no effort to do so." (Bankr. Order at 9.)

Nevertheless, the Bankruptcy Court conducted its own review of the record and found that the City had neglected to consider the following benefits to the City under the Plan:

(1) when the Plan becomes effective, the City will receive the largest payment made to any claimant in the case, i.e., more than $2.5 million; (2) that payment will be

-18-

made as soon as any other payment to be made pursuant to the Plan and substantially sooner than payments to most other claimants; (3) the City will have its rights as a landlord under the Lease that the Reorganized Debtor will have assumed and thus will receive ongoing payments due under that Lease, just as it has received Lease payments since this case was filed; and (4) by not later than August 2017, i.e., the end of the second and final term of the Lease between the City and the Reorganized Debtor, the Reorganized Debtor either will exercise its purchase option at a price of $5 million or will no longer have the right to operate the Leased Facilities. None of this remotely suggests irreparable harm.

(Bankr. Order at 9-10.)

Additionally, the Bankruptcy Court noted that the City repeatedly argued that during the Stay Hearing that "it would be harmed if it were left with an operator with whom it is dissatisfied and which had not met its obligations under the Lease." (*Id.* at 10.) However, the Bankruptcy Court noted that the prepetition payment breaches will be cured under the Plan, and that "[t]he City's dissatisfaction simply does not rise to the level of irreparable harm as defined by *Griepentrog*." (*Id.*)

Moreover, the Bankruptcy Court addressed the City's argument that the Bankruptcy Court compromised the City's ability to effectively appeal the assumption issues by addressing them in the Confirmation Opinion. Specifically, the Bankruptcy Court noted that the City argued, as it does now before this court, that "these appealable issues could be rendered equitably moot with the substantial consummation of the Debtor's Plan and that this alone constitutes irreparable injury." In rejecting this argument, the Bankruptcy Court cited relevant case law to support its finding that "the fact that an appeal may become moot if a stay is not granted does not, in itself, demonstrate or establish irreparable harm." (Bankr. Order at 11, citing *In re Baldwin United Corp.,* 45 B.R. 385, 386 (Bankr. S.D. Ohio 1984); *see also In re Public Service Co. of New Hampshire,* 116 B.R. 347, 350 (Bankr. D.N.H. 1990) (possible mootness not enough to show sufficient injury to appellant to warrant a stay); *In re Dakota Rail,* 111 B.R. 818, 821 (Bankr. D. Minn. 1990); *In re Charter Co.,*

-19-

72 B.R. 70, 72 (Bankr. M.D. Fla. 1987); *In re Great Barrington Fair and Amusement, Inc.,* 53 B.R.
237, 240 (Bankr. D. Mass. 1985)).  However, in accordance with *Griepentrog,* the Bankruptcy Court
weighed the City's mootness argument against other parties' interests, ultimately finding that "the
risk of mootness is counterbalanced by the harm that would result to the State of Ohio and other
unsecured creditors who would have no idea when the Effective Date, from which their rights under
the Plan are computed, would occur."  (Bankr. Order at 11.)   In light of the foregoing, the court
finds that the Bankruptcy Court's determination that the City failed to establish irreparable harm is
well-taken.

### C. Harm to Others and Public Interest

#### 1. Harm to Others

In its Motion to Stay before the Bankruptcy Court, the City argued  that  the Debtor will not
be harmed if a stay is granted since a stay would simply preserve the status quo pending appeal. As
the Bankruptcy Court noted, the City argues in effect that delay is the only harm that would be
imposed upon the Debtor in the event of a stay.  However, the Bankruptcy Judge found that "the
evidence is completely at odds with the City's assertion" that the Debtor, unsecured creditors, and
the State of Ohio will not suffer harm if a stay was issued.  (Bankr. Order at 11-14.)

First, the Bankruptcy Judge found that it was likely that the  issuance of  a stay would  harm
the Debtor by derailing the Debtor's settlement  negotiations with the  EPA  and  thereby
endangering consummation of the Plan at the conclusion of an appeal.  (*Id.* at 12.)  The Bankruptcy
Court also found, based upon the testimony of Mr. Bees,  that a stay would hinder the Debtor's
ability
to negotiate terms with its large  customers. (*Id.* at 11-13.)  Additionally, a stay would further extend
the timing of payments to Unsecured Creditors who are suffering a 90% loss on their claims under

-20-

the Plan, and asking those creditors to wait the duration of an appeal period would constitute substantial prejudice. (*Id.* at 13.)  Finally, the Bankruptcy Court found that the State of Ohio would be damaged immediately if a stay is issued because "the initial $150,000 that the Debtor would pay at the Effective Date toward the State of Ohio priority claims pursuant to Section 5.5 of the Plan would not be paid until some uncertain date into the future."  (*Id.*)  Significantly, "[t]his initial payment was the result of negotiations between the Debtor and the State of Ohio which ultimately resulted in the agreement by the State of Ohio to modify what might have been the absolute priority treatment of various state agencies with claims that were or might have been argued to have various priorities under 11 U.S.C. § 507."  (*Id.*)  Furthermore, the Bankruptcy Court noted that, since the Plan provides for the Debtor to execute a promissory note in favor of the State of Ohio with interest commencing with the Effective Date, the accrual of interest will be delayed if a stay is granted. *Id.* at 14.  Accordingly, the Bankruptcy Court found that the City failed to demonstrate an absence of harm to other interested parties if a stay was issued.  (*Id.*)

The court finds that the above-stated factual determinations of the Bankruptcy Judge that others would be harmed if a stay is issued are well-taken and do not constitute clear error. Accordingly, the court finds the City fails to show, as required by *Griepentrog*, that the Debtor, unsecured creditors, and the State of Ohio are not likely to suffer harm if a stay is issued.

### 2. Public Interest

In its Motion to Stay before the Bankruptcy Court, the Bankruptcy Court found that there is no way a stay would serve the public interest.  (Order at 14.)  To the contrary, the Bankruptcy Judge found that "implementation of the Plan will enhance the Debtor's ability to provide reliable utility service to three hospitals, the University, downtown commercial and government offices, and various

residents of the City." (*Id.*)  Moreover, the Bankruptcy Judge concluded that, since consummation of the Plan will make the taxpayers whole on the Lease, "granting a stay would harm the public interest because it would jeopardize the City's recovery on behalf of the taxpayers of the amounts due and owing from the Debtor for its use and occupancy of the Leased Premises."  *Id.*

The court finds that the above-stated factual determinations of the Bankruptcy Judge are well-taken and do not constitute clear error.  Accordingly, the court finds the City fails to show, as required by *Griepentrog*, that a stay will serve the public interest.

### D. Balancing the Factors

After balancing the *Griepentrog* factors discussed above, the court finds that the Bankruptcy Court did not abuse its discretion in denying the City's Motion to Stay.  The City failed to demonstrate a likelihood of success on the merits of its appeal.  *Griepentrog,* 945 F.2d at 153.  While *Griepentrog* would allow the City to meet its burden on this first prong by demonstrating "serious questions going to the merits" if the City had correspondingly shown a high degree of irreparable injury, the City failed to show such injury.  In fact, the City failed to carry its burden of showing it would be irreparably harmed in the absence of a stay.  Finally, any harm to the City in the absence of a stay is outweighed by the harm that would flow to the Debtor, the Unsecured Creditors, and the State of Ohio if the Motion to Stay were granted.  Accordingly, the court denies the City's Motion to Stay.

IT IS SO ORDERED.

/s/ SOLOMON OLIVER, JR.
UNITED STATES DISTRICT JUDGE

February 19, 2009

-22-